Argued and submitted March 13, affirmed May 6, reconsideration denied July 24,
petition for review allowed October 6, 1987 (304 Or 240)
See later issue Oregon Reports

In the Matter of the Permit Application
No. 63266 - City of Portland Hydro-Electric
Power Diversion from Bull Run River.

DIACK et al,
*Petitioners,*

*v.*

CITY OF PORTLAND et al,
*Respondents.*

(49252; CA A37696)

736 P2d 198

William P. Hutchison, Jr., Portland, argued the cause for petitioners. With him on the brief were David R. Maier and Hutchinson, Hutchison & Hooper, Portland.

Ruth M. Spetter, Portland, argued the cause and filed the brief for respondent City of Portland.

Philip Schradle, Assistant Attorney General, Salem, argued the cause for respondent Water Resources Department - State of Oregon. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

WARDEN, P. J.

## WARDEN, P. J.

Petitioners seek review of an order of the Water Resources Department[1] (the Department) which approved an application by the City of Portland (the City) to divert water from the Bull Run River, a tributary of the Sandy River, in order to generate electricity. They assert that the proposed diversion will violate the Scenic Waterways Act, ORS 390.805 - ORS 390.925, and that the Department's order is defective in a number of other respects. We affirm.

Since the beginning of this century, the city has received its municipal water from the Bull Run River on the western slopes of Mt. Hood. That river empties into the Sandy River a short distance above a stretch of the Sandy that has been designated a scenic waterway and is heavily used for boating and other recreational purposes. In the early 1980's the City decided to develop a second source of water closer to the City by drilling ground water wells near the Columbia River. As part of the project it installed pumps to move the water uphill from the Columbia to the City's main distribution reservoir on Powell Butte. The pumps could function in reverse as generators if the water flowed downhill from Powell Butte to the river.

Because the City intended to use the ground water wells primarily as a reserve supply, the pipeline between the wells and Powell Butte would be idle much of the time. The City decided to make use of the idle time to generate electricity by running Bull Run water that was surplus to its needs through the pumps. It therefore applied for a permit to use Bull Run water for generating purposes. The water would flow from one of the dams on the Bull Run River to Powell Butte through the City's existing pipelines. From there, instead of going to the City's customers, that water would run to the pumps, generate power and be discharged into the Columbia River. The City intended to sell the power to Portland General

---

[1] Although the Water Resources *Department* issued the permit that petitioners challenge, the Water Resources *Commission* (formerly the Water Policy Review Boad) conducted the hearing and issued the order that is the necessary foundation for the permit. *See former* ORS 537.185 (*repealed by* Or Laws 1985, ch 673, § 185); *Steamboaters v. Winchester Water Control Dist.*, 69 Or App 596, 688 P2d 92 (1984), *rev den* 298 Or 553 (1985). Our references to the Department may, therefore, include matters that were actually the Commission's doing.

Electric Company (PGE). This system would replace a smaller generating facility operated by PGE near the Bull Run Dam. The PGE facility did not affect the flow in the Sandy, because it returned the water that it used to the Bull Run River.

The City's application requested permission to divert varying amounts of water during most of the year, with no diversion during the two or three months of lowest river flow. After a tortuous procedural history, the Department granted it a license to divert 170 cubic feet per second (cfs) of water from December 1 of each year through May 31 of the following year, subject to various minimum stream flow requirements; the license does not permit diversion during the rest of the year.

· Petitioners attack the granting of the permit on several grounds. They first assert that it violates the Scenic Waterways Act. The crucial portion of that act is ORS 390.835(1), which provides:

> "It is declared that the highest and best uses of the waters within scenic waterways are recreation, fish and wildlife uses. The free-flowing character of these waters shall be maintained in quantities necessary for recreation, fish and wildlife uses. No dam, or reservoir, or other water impoundment facilities shall be constructed or placer mining permitted on waters within scenic waterways. No water diversion facility shall be constructed or used except by right previously established or as permitted by the Water Resources Commission, upon a finding that such diversion is necessary to uses designated in ORS 536.310(12), and in a manner consistent with the policies set forth under ORS 390.805 to 390.925. The Water Resources Commission shall administer and enforce the provisions of this subsection."

Petitioners argue that this statute prohibits the Commission from permitting the diversion of water which would otherwise enter a scenic waterway unless the diversion is necessary for human or livestock consumption, which are the only uses specifically mentioned in ORS 536.310(12). Petitioners' reading of the statute is incorrect.

■■ ORS 390.835(1) declares that the highest and best uses of waters *within* scenic waterways are recreation, fish and wildlife uses. It then prohibits dams or water impoundments

*within* scenic waterways and requires a permit for the construction of a diversion facility *within* a scenic water way. The statute does not explicitly cover diversion of water *before* it enters the waterway. It does not even absolutely prohibit diversion facilities within a scenic waterway but allows them, if they have a permit or prior right and are necessary for a beneficial use described in ORS 536.310(12).[2] The statutory scheme only considers construction within the scenic waterway itself.

■    That the statute explicitly places limits on actions within the scenic waterway does not mean that it has no impact on a proposed upstream diversion of water. The Attorney General concluded, in a letter opinion issued during the course of this proceeding, that the Department must ensure that there will be sufficient water in the scenic portion of the river to maintain the recreational, fish and wildlife uses of the scenic waterway. He based his opinion on the statutory declaration that those are the highest and best uses of the water and on the power of the Department to establish minimum stream flows. ORS 536.325. We agree with the Attorney General's conclusion that the Department must preserve stream flows in scenic waterways at a level sufficient to achieve the statutory purpose.

■    The question, then, is whether the Department has shown that the diversion which the permit will allow will leave sufficient water in the scenic waterway to achieve its highest and best uses of recreation, fish and wildlife uses. The Commission's opinion carefully examines the technical information presented. Its conclusion that the diversion of a relatively small portion of the total flow, limited to the months of highest flow and lowest recreational use, will not affect the scenic waterway uses is a reasonable conclusion based on the facts it found. Petitioners' attacks on those facts and on the Commission's reasoning are not well taken. The information in the record may not be as complete as might be acquired with

---

[2] Petitioners appear to read ORS 536.310(12) incorrectly. That statute does not limit the uses for which diversions are permitted to human and livestock consumption; it simply gives those uses priority over other beneficial uses. The statute thus does not absolutely prohibit diversion for hydroelectric power generation, which is a beneficial use. In any event, the provision is irrelevant to this case because the permit does not allow diversion *within* the scenic waterway.

unlimited time and money, but it is adequate for these purposes. Although the study of fish habitat focused only on two species, the Commission could properly conclude that the lack of adverse impact on those two species, which are particularly sensitive to low water, was evidence that there would be no significant adverse impacts on other species. Petitioners' other arguments do not require discussion.

Affirmed.