Argued and submitted January 19, the decisions of the Court of Appeals and Water
Resources Commission reversed and remanded to Water Resources Commission
July 26, reconsideration denied September 20, 1988

In the Matter of the Permit
Application No. 63266 - City
of Portland Hydroelectric Power
Diversion from Bull Run River.

DIACK et al,
*Petitioners on Review,*

*v.*

CITY OF PORTLAND et al,
*Respondents on Review.*

(WPRB 63266; CA A37696; SC S 34223)

759 P2d 1070

William P. Hutchison, Jr., Portland, argued the cause and filed the petition on behalf of the Petitioners on Review. With him on the petition were David R. Maier and Hutchinson, Hutchison and Hooper, Portland.

Philip Schradle, Assistant Attorney General, Salem, argued the cause on behalf of Respondent on Review Water Resources Department - State of Oregon.

Ruth M. Spetter, Office of City Attorney, Portland, argued the cause on behalf of Respondent on Review City of Portland.

Noelle Billups, Assistant County Counsel, Portland, filed an *amicus curiae* brief on behalf of Multnomah County. With her on the brief was Laurence Kressel, County Counsel for Multnomah County, Portland.

GILLETTE, J.

## GILLETTE, J.

In this case we are called upon to examine the impact, if any, of provisions of Oregon's Scenic Waterways Act, ORS 390.805 *et seq* (the Act), on a decision to permit hydroelectric generation on a portion of a river that thereafter flows into a scenic waterway. The Water Resources Commission (the commission) issued a permit allowing the City of Portland (the city) to divert water from the Bull Run River for the generation of hydroelectricity. The Bull Run River flows into the Sandy River a short distance above a 12.5-mile stretch of the Sandy River designated as a scenic waterway pursuant to the Act and OAR 736-40-010(7). Petitioners invoke the Scenic Waterways Act to support their opposition to the city's application. The Court of Appeals affirmed the order granting the application. We reverse.

At this point, a brief recitation of the city's use of Bull Run water is useful. The city maintains two reservoirs on the Bull Run River. Those reservoirs collect water for the city's use and, from 1894 to 1984, were the sole source of the city's water. Three conduits carry water from the reservoirs to terminal storage facilities located on Powell Butte. The maximum delivery capacity of the conduits is approximately 350 cubic feet per second (cfs), which is about twice the city's normal requirement.

Before 1984, excess Bull Run water was used to generate electricity, either at hydroelectric facilities maintained at the city's reservoir, or at the Roslyn Lake hydroelectric facility owned by Portland General Electric (PGE). The water then was discharged back into the Bull Run River and resumed its normal course into the Sandy River and through the Sandy River Scenic Waterway.

In 1984, the city developed a ground water well field on the south bank of the Columbia River to serve as an alternate source of water. This system includes a storage tank, a booster pump station and a water main connecting with the three conduits that divert Bull Run water to Powell Butte. The pump station pumps water from the well field storage tank to Powell Butte Reservoir for distribution. When not being used to pump water, the pump station's turbines may be operated in reverse mode to generate electricity.

During certain months, when water from the well field is not needed, the city proposes to pump excess Bull Run water to the Columbia River booster pump station to generate electricity, which it then plans to sell to PGE. After passing through the booster pump station, the water would be discharged into the Columbia River instead of being returned to the Bull Run River. The net effect would be to reduce the flow of Bull Run water into the Sandy and through the scenic waterway.

The city applied to the Commission for a permit to use Bull Run water for generating purposes. Petitioners opposed the application because the project would divert water that otherwise would flow through the Sandy River scenic waterway. For that reason, petitioners argued that the city must satisfy the requirements of ORS 390.835(1), which provides:

> "It is declared that the highest and best uses of the waters within scenic waterways are recreation, fish and wildlife uses. The free-flowing character of these waters shall be maintained in quantities necessary for recreation, fish and wildlife uses. No dam, or reservoir, or other water impoundment facilities shall be constructed or placer mining permitted on waters within scenic waterways. *No water diversion facility shall be constructed or used except by right previously established or as permitted by the Water Resources Commission, upon a finding that such diversion is necessary to uses designated in ORS 536.310(12), and in a manner consistent with the policies set forth under ORS 390.805 to 390.925.* The Water Resources Commission shall administer and enforce the provisions of this subsection." (Emphasis added).

The Commission conducted hearings and issued a final order granting the city a permit to divert 170 cfs from December 1 through May 31 of each year, subject to various minimum stream flow requirements. The Commission concluded that:

> "The Scenic Waterways Act and supporting rules apply to this application. Operation of the proposed project would reduce Bull Run River discharges to the lower reach of the Sandy River which is a designated scenic waterway. This designation requires a determination that the free-flowing character of the Sandy River shall be maintained in quantities necessary for recreation, fish and wildlife uses during the

times of diversion of water from Bull Run River by this project. Conditions on the schedule of operation, maintenance of instream flows and the small percentage flow reduction compared to the level of flows in the Sandy would avoid impacts on scenic waterway and other water use values of importance to the public and insure that quantities necessary for recreation, fish and wildlife uses shall be maintained as further set forth in separate findings. It is concluded, therefore, that the proposed project will not impair or be detrimental to the public interest."

Petitioners petitioned for judicial review. The Court of Appeals affirmed the issuance of the permit. *Diack v. City of Portland,* 85 Or App 255, 736 P2d 198 (1987). The court concluded that the emphasized portion of ORS 390.835(1), quoted above, does not apply to diversions of water outside the scenic waterway itself. 85 Or App at 259. Thus, the city need not show that the diversion was necessary to uses designated in ORS 536.310(12). However, the court also concluded that the Commission must ensure that water enters a scenic waterway "in quantities necessary for recreation, fish and wildlife uses." ORS 390.835(1). Finally, the court held that there was substantial evidence in the record to support the Commission's conclusion that "the diversion of a relatively small portion of the total flow, limited to the months of highest flow and lowest recreational use, will not affect the scenic waterway uses." 85 Or App at 259.

Petitioners petitioned for review, arguing that the Court of Appeals erred (1) in limiting the restrictions set out in ORS 390.835(1) to diversions of water within the scenic waterway itself and (2) in holding that there was sufficient evidence to support issuance of the permit.

I

We first address the city's contention that the Commission lacked jurisdiction over its application. The city raised this issue in a letter accompanying its application, but chose to "acquiesce" in the Commission's jurisdiction for the purposes of this case. In its post-argument memorandum of additional authorities to this court, the city resurrects its jurisdictional challenge.

At the outset, we reject petitioners' argument that the

city has waived its right to challenge the Commission's jurisdiction. It is well settled that an agency's jurisdiction cannot be conferred by stipulation of the parties. *Hoffman v. City of Portland,* 294 Or 150, 156, 654 P2d 1106 (1982); *City of Hermiston v. ERB,* 280 Or 291, 295, 570 P2d 663 (1977); *Lane Council Govts. v. Emp. Assn.,* 277 Or 631, 636, 561 P2d 1012, *reh denied,* 278 Or 335, 563 P2d 729 (1977). "Jurisdiction" depends on whether the matter is one that the legislature has authorized the agency to decide. If a party may not stipulate to an agency's jurisdiction, it follows that the party also may not waive a jurisdictional issue by "acquiescence." The issue is properly before this court.

■ In general, the Commission has the authority to consider applications for the appropriation of water. ORS 537.130 provides:

"(1) Except for the use exempted under ORS 537.142 [not applicable here], any person intending to acquire the right to the beneficial use of any of the surface waters of this state shall, before beginning construction, enlargement or extension of any ditch, canal or other distributing or controlling works, or performing any work in connection with the construction, or proposed appropriation, make an application to the Water Resources Commission for a permit to make the appropriation.

"(2) Except for the use exempted under ORS 537.142, no person shall use, store or divert any waters until after the commission issues a permit to appropriate the waters."

For the purposes of ORS chapter 537, a "person" includes a municipal corporation. ORS 536.007(6). *See also* ORS 537.282 through 537.299 (special provisions covering municipal applicants for permits to appropriate water for hydroelectric power).

Standing alone, the above provisions clearly authorize the Commission to conduct hearings in cases such as these. However, ORS 536.320(2) provides:

"The commission shall not have power:

"* * * * *

"(2) To modify, set aside or alter any existing right to use water or the priority of such use established under existing laws * * *."

The city argues that the Commission does not have the power to alter Portland's preexisting right to use Bull Run water. ORS 538.420 provides:

"(1)  Exclusive right to the use of waters of Bull Run and Little Sandy Rivers is granted to the City of Portland. However, the Water Rights Act (as defined in ORS 537.010) shall not impair the rights of any person who, on February 24, 1909, had any vested right to or valid appropriation or bona fide notice of appropriation of the waters of either Bull Run River or Little Sandy River, under laws theretofore in effect or under any valid contract or deed of conveyance theretofore made with or by the City of Portland.

"(2)  ORS 541.010 to 541.080 [governing water companies organized under 1891 act] shall not apply to Bull Run Creek or River."

We disagree that the above provision gave the city the unlimited right to use Bull Run water for hydroelectric generation. As originally enacted in 1909, ORS 538.420 provided:

"The exclusive right to the use of the waters of Bull Run and Little Sandy rivers is hereby granted to the city of Portland, and all rights to the waters of the lakes, rivers and streams of this state heretofore acquired for the purposes of municipal water supply are hereby confirmed, and no rights which shall be acquired under this act shall impair the rights of any municipal corporation to waters heretofore taken. The board of control shall reject, or grant, subject to municipal use, all applications where, in its judgment, the appropriation of the waters applied for impair a municipal water supply. It shall be the duty of municipal corporations of the state, on request of the state engineer, to furnish to him a statement of the amount and source of the municipal water supply, with probable increase or extension of the same; *provided*, that this act shall not be deemed or held to and shall not impair the rights of any person, association or corporation who may, at and prior to the time this act is filed in the office of the secretary of state, have any vested right to or valid appropriation or *bona fide* notice of appropriation of the waters of either the Bull Run or the Little Sandy river, under laws heretofore in effect or under any valid contract or deed of conveyance heretofore made with or by the city of Portland."

Lord's Oregon Laws 1910, p 2385-86, § 6672.

Read as a whole, the statute defined the rights of

cities to use water for municipal purposes. It was codified under Lord's Oregon Laws 1910, title XLIII, chapter VI, part (g), and was entitled "Of Municipal Water Supply." Separate provisions governed the appropriation of water for mining and electrical power. Lord's Oregon Laws 1910, title XLIII, chapter II. The Bull Run River was not exempted from the requirements of those provisions. In comparison, section 6525 of chapter I, title XLIII, Lord's Oregon Laws 1910, which governed the appropriation of water for "General Use and Irrigation," specifically provided that "no part of this chapter shall apply to Bull Run creek or river, or the waters thereof, being in Clackamas and Multnomah counties, Oregon, from which river or stream water is supplied to the city of Portland."

From the above we conclude that ORS 538.420 was originally enacted to ensure the City of Portland an adequate municipal water supply by granting it exclusive access to the Bull Run River for municipal purposes. The legislature did not intend to grant the city the unrestricted use of Bull Run water for purposes such as the generation of hydroelectric power. The statute has not since been amended to allow the city unlimited access to Bull Run water for such purposes. Therefore, notwithstanding ORS 538.420, the Commission has jurisdiction over the city's application for a permit to operate a hydroelectric facility on the Bull Run River.

## II

The next issue is the effect, if any, of the Scenic Waterways Act on the city's application. The Scenic Waterways Act was proposed by initiative petition and was voted into law on November 3, 1970. As originally enacted, ORS 390.835(1) provided:

"Subject to subsection (12) of ORS 536.310, it is declared that the highest and best uses of the waters within scenic waterways are recreation, fish and wildlife uses. The free-flowing character of these waters shall be maintained in quantities necessary for recreation, fish and wildlife uses. No dam, or reservoir, or other water impoundment facility shall be constructed on waters within scenic waterways. No water diversion facility shall be constructed on such waters except as necessary to uses designated in subsection (12) of ORS 536.310 or as necessary to existing uses of related adjacent land. The submerged and submersible lands under and along

such waterways shall not be modified by placering, dredging or by any other means."

Or Laws 1971, ch 1, § 4.

In 1973, the legislature amended ORS 390.835 as follows:

"(1) [*Subject to subsection (12) of ORS 536.310,*] It is declared that the highest and best uses of the waters within scenic waterways are recreation, fish and wildlife uses. The free-flowing character of these waters shall be maintained in quantities necessary for recreation, fish and wildlife uses. No dam, or reservoir, or other water impoundment facility shall be constructed **or placer mining permitted** on waters within scenic waterways. **No water diversion facility shall be constructed or used except by right previously established or as permitted by the State Engineer, upon a finding that such diversion is necessary to uses designated in subsection (12) of ORS 536.310, and in a manner consistent with the policies set forth under ORS 390.805 to 390.925. The state Engineer shall administer and enforce the provisions of this subsection.**

"**(2)** No [*water diversion*] **bank protection works or dredging** facility shall be constructed **or used** on such waters, except as [*necessary to uses designated in subsection (12) of ORS 536.310 or as necessary to existing uses of related adjacent land. The submerged and submersible lands under and along such waterways shall not be modified by placering, dredging or by any other means*] **permitted by the Director of the Division of State Lands and approved by the State Land Board for purposes consistent with the policies set forth under ORS 390.805 to 390.925 for scenic waterways, and in a manner consistent with the policies set forth under ORS 541.605 to 541.660 for removal of material from the beds and banks and filling of any waters of this state. The Director of the Division of State Lands shall administer and enforce the provisions of this subsection.**"

Or Laws 1973, ch 756, § 1 (additions in boldface; deletions bracketed and italicized).

The Court of Appeals construed ORS 390.835(1) as follows:

"ORS 390.835(1) declares that the highest and best uses of

waters *within* scenic waterways are recreation, fish and wildlife uses. It then prohibits dams or water impoundments *within* scenic waterways and requires a permit for the construction of a diversion facility *within* a scenic water way [*sic*]. The statute does not explicitly cover diversion of water *before* it enters the waterway. It does not even absolutely prohibit diversion facilities within a scenic waterway but allows them, if they have a permit or prior right and are necessary for a beneficial use described in ORS 536.310(12). The statutory scheme only considers construction within the scenic waterway itself."

85 Or App at 258-59 (emphasis in original; footnote omitted).

■ The Court of Appeals read the fourth sentence in ORS 390.835(1) as requiring a permit only for diversion facilities constructed or used within scenic waterways, even though the statute itself places no such limitation on the location of the diversion. Apparently, the Court of Appeals concluded that those who enacted the Scenic Waterways Act, having limited the scope of the third sentence in ORS 390.835(1) to waters within scenic waterways, intended to include the same limitation in the fourth sentence. For the reasons set out below, we disagree with that interpretation.

The 1973 legislature rewrote the fourth sentence in ORS 390.835(1) without using the limiting phrase, "in such waters." The legislative history does not indicate what the legislature meant by that change. Under the interpretation advocated by the city and by the Commission, the change would mean nothing.

This court has been "unwilling to deem a legislative act meaningless unless no other reasonable conclusion is available." *1000 Friends of Oregon v. Wasco County Court,* 299 Or 344, 358, 703 P2d 207 (1985). The legislature's failure to include the phrase "in such waters" was a material change in the language of the fourth sentence in ORS 390.835(1), and we presume that the legislature intended a material change in meaning. *See Fifth Ave. Corp. v. Washington County,* 282 Or 591, 581 P2d 50 (1978). The legislature may have concluded that it was insufficient to restrict only those diversions located within a scenic waterway. If so, it is reasonable to presume that the legislature intended to expand the scope of the fourth sentence in ORS 390.835(1) in order to protect water destined

for a scenic waterway. We conclude that no diversion of water that otherwise would enter a scenic waterway may be permitted unless the requirements of ORS 390.835(1) are met.

Under ORS 390.835(1), the Commission may approve a diversion only if it finds that the diversion is "necessary to uses designated in ORS 536.310(12)." ORS 536.310(12) provides:

> "When proposed uses of water are in mutually exclusive conflict or when available supplies of water are insufficient for all who desire to use them, preference shall be given to human consumption purposes over all other uses and for livestock consumption, over any other use, and thereafter other beneficial purposes in such order as may be in the public interest consistent with the principles of Chapter 707, Oregon Laws 1955, under the existing circumstances * * *."

The Commission made no findings as to whether the city's proposed diversion is necessary to a beneficial use described in ORS 536.310(12). Accordingly, we reverse and remand to the Commission for such findings.

Petitioners also object to the Commission's findings that:

> "The proposed project would generate revenues in excess of those currently being realized through the use of water from the Bull Run River;" and

> "The proposed project would employ an established technology and would produce increased economic benefits through more intensive use of the waters involved."

Under the city's original proposal, the project would have operated for nine months out of the year and the city would have been required to maintain a minimum stream flow of 850 cfs. The city estimated that, operating on that schedule, the project would generate a net income of $216,000 during the first year. However, under the permit issued by the department, the project will be able to operate for only six months out of the year and must maintain a minimum stream flow of between 1,500 and 2,000 cfs. The Commission nonetheless adopted, without discussion, the city's estimate of the amount of revenue the project would generate under the proposed schedule of operation. The Commission does not appear to have taken into account the reduction in the number of days the project would be allowed to operate under the permit. The

Commission's findings that accepted the revenue-generating capability of the *proposed* project do not support its conclusion that the project, operating under the restrictions imposed, will be of sufficient economic value to justify issuing the permit. On remand, the Commission should determine the income that the project will generate if it operates under the restrictions imposed by the permit, and make appropriate findings.

Petitioners also object that the Commission did not adequately explain its application of some of the statutory standards set out in ORS 390.835(1) and 537.170(5). They first argue that the Commission did not adequately explain how its order would maintain "the free-flowing character" of the waters within the Sandy River scenic waterway. ORS 390.835(1). The term "free-flowing" is self-explanatory and requires no interpretation by the Commission or by this court. The legislature appears to have used the term in a purely descriptive sense; it did not intend to establish a separate statutory standard. Petitioners' contentions to the contrary are not well taken.

In contrast, the requirement that the free-flowing character of the water "be maintained in sufficient quantities necessary for recreation, fish and wildlife uses" does set a standard the Commission must apply. *See Springfield Education Assn. v. School Dist.,* 290 Or 217, 228, 621 P2d 547 (1980). In that case, this court stated:

> "* * * The legislature may use general delegative terms because it cannot foresee all the situations to which the legislation is to be applied and deems it operationally preferable to give to an agency the authority, responsibility and discretion for refining and executing generally expressed legislative policy. * * *"

*Id.*

ORS 390.835(1) expresses the general legislative policy that recreation, fish and wildlife uses are the highest and best uses of waters within scenic waterways. To that end, the statute delegates to the Commission the authority to determine the level of stream flow necessary to support recreation, fish and wildlife uses which may themselves differ from time to time. In this case, the Commission determined that minimum stream flows of 1,500 cfs in December, 1,900 in January

and February, and 2,000 in March through May, "are required for protection of salmon and steelhead habitat and will also benefit other aquatic life, wildlife and recreation uses in the Sandy River." The Commission also determined that "[a]n instream flow of 1500 cfs would provide protection for whitewater boating and angling during the period when such use is most prevalent and not otherwise limited by naturally-occurring low flows."[1]

■  Petitioners argue that "[t]he amended order was devoid of any link between the [Commission's] findings of fact and its conclusions which would allow a review of the [Commission's] reasoning to determine that the statutory standards were met." Because petitioners' argument never becomes more specific, it is difficult to determine their precise objection. The factual findings made by the Commission, some of which are quoted in the preceding paragraph, fully support its conclusion that the stream flows designated in the order will adequately protect recreation, fish and wildlife uses.[2] Absent a more fully articulated objection, we hold that they are sufficient.

Petitioners also object that the Commission failed to explain how it applied the standards set out in ORS 537.170(5)(b) and (e).[3] ORS 537.170(5) provides, in part:

"In determining whether the proposed use would impair or be detrimental to the public interest, the Water Resources Commission shall consider:

"* * * * *

"(b)  The maximum economic development of the waters involved.

"* * * * *

---

[1] The minimum stream flows set by the Commission are subject to change "[i]f, after commencement of project operations, the Department of Fish and Wildlife determines that additional protective measures need to be taken for the benefit of fish life * * *."

[2] Multnomah County filed an *amicus curiae* brief in which it argued that the Commission's factual findings with regard to minimum stream flows were not supported by substantial evidence in the record. Because the issue was not presented in the petition for review, we do not address it.

[3] At the time relevant to this case, ORS 537.170(5) was codified at ORS 537.170(3). *See* Or Laws 1985, ch 569, § 19.

"(e)   The prevention of wasteful, uneconomic, impracticable or unreasonable use of the waters involved."

This provision represents a complete expression of legislative policy. The terms, "maximum economic development" and "wasteful, uneconomic, impracticable or unreasonable use," are examples of what this court has called "inexact terms." *Springfield Education Assn., supra,* 290 Or at 224. In such a case, it is the agency's task to interpret ambiguous statutory terms in a way that effectuates the underlying statutory policy. The agency may do so either by rule or by order in a contested case. *Id.*[4] The only statement in the Commission's order addressing this provision is the following, labeled "Ultimate Findings":

"In consideration of the provisions of ORS 537.170 ([5]a-g), the project proposed in Permit Application 63266 is an allowed use of available water providing increased economic and multiple use benefits through efficiency and diversity of use without detriment to existing rights or the control of the water resource. Effects on other water uses which may result from reduced Bull Run discharge to the Sandy River would be minimized by seasonal operational constraints, natural discharge patterns in the Sandy River and establishment of instream flows for the proposed project."

We agree with petitioners that the above statement does not adequately explain how the Commission applied the public interest criteria set out in ORS 537.170(5). It is little more than a regurgitation of the statutory language, without analysis. On remand, the Commission should explain more fully its application of the public interest criteria, pointing to the facts that it believes (if it still does) permit it to make the "ultimate" findings and the conclusions it draws from them.

Finally, petitioners argue that the Commission improperly applied the public interest criteria in ORS 537.170(5). We have already determined that the agency's order is not sufficiently explicit on that point to allow meaningful judicial review. On remand, the Commission will have an opportunity to explain its application of those criteria.

---

[4] The Commission has since promulgated an administrative rule defining the terms set out in OAR 537.170(5). OAR 690-74-015. However, the hearing in this case took place before the effective date of that rule. *See* OAR 690-74-095.

The decisions of the Court of Appeals and the Water Resources Commission are reversed. The case is remanded to the Water Resources Commission for proceedings consistent with this opinion.