Argued and submitted October 9, 2020, reversed July 8, 2021

THE CITY OF PORTLAND,
*Petitioner,*

*v.*

BUILDING CODES DIVISION,
a Department of Consumer and Business Services,
*Respondent.*

Building Codes Division
C20150200; A168754

496 P3d 1108

The City of Portland seeks judicial review of a final order of the Director of the Department of Consumer and Business Services, Building Codes Division (BCD). The BCD concluded that a provision of Oregon's building code preempted a city ordinance requiring high-occupancy nightclubs to have fire sprinklers and both imposed a civil penalty on the City of Portland and ordered it to repeal the ordinance. The city argues that state law does not give the BCD the power to penalize or compel the repeal of the city's ordinances. *Held*: Neither of the statutes relied upon by the BCD authorized it to bring the action for penalties and repeal of the city's ordinance. ORS 455.770 does not authorize investigation of a city for enacting an ordinance, let alone authorize the BCD to order the repeal of the ordinance as a "corrective action" as part of the BCD's investigation. Nor does ORS 455.895 operate as an independent grant of authority for the BCD to impose a civil penalty on a municipality for the enactment and enforcement of an ordinance.

Reversed.

Denis M. Vannier argued the cause for petitioner. Also on the reply brief was YoungWoo Joh.

Christopher Page, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

KAMINS, J.

Reversed.

**KAMINS, J.**

The City of Portland seeks judicial review of a final order of the Director of the Department of Consumer and Business Services, Building Codes Division (BCD).[1] The BCD concluded that a provision of Oregon's building code preempted a city ordinance requiring high-occupancy nightclubs to have fire sprinklers and both imposed a civil penalty on the City of Portland and ordered it to repeal the ordinance. We agree with the city that state law does not give the BCD the power to penalize or compel the repeal of the city's ordinances, and we therefore reverse the final order.

The facts underlying the final order are not disputed for purposes of our review, but they require some statutory context—mostly to understand the intersection between building codes and fire regulations under Oregon law, and the role played by municipalities like the City of Portland.

The BCD is a section within the Department of Consumer and Business Services that is responsible for the promulgation, amendment, and administration of the state building code, which is governed by ORS chapter 455. *See generally Studor, Inc. v. State of Oregon*, 224 Or App 299, 301, 197 P3d 554 (2008), *rev den*, 347 Or 44 (2009) (describing the regulatory framework for the BCD). ORS chapter 455 authorizes the BCD "to promulgate a state building code to govern the construction, reconstruction, alteration and repair of buildings and other structures and the installation of mechanical devices and equipment therein, and to require the correction of unsafe conditions caused by earthquakes in existing buildings." ORS 455.020(1). The "state building code" is made up of "specialty codes" adopted by the BCD under various authorizing statutes. ORS 455.010(8).

The state building code is intended to be "applicable and uniform throughout this state and in all municipalities," and "no municipality shall enact or enforce any ordinance, rule or regulation relating to *the same matters*

---

[1] For purposes of readability, and because it does not affect our analysis, we generally do not distinguish between the director, the department, and the division in this case.

*encompassed by the state building code but which provides different requirements* unless authorized by the Director of the Department of Consumer and Business Services." ORS 455.040(1) (emphasis added). *See also* ORS 455.020(4) ("This chapter and any specialty code does not limit the authority of a municipality to enact regulations providing for local administration of the state building code; local appeal boards; fees and other charges; abatement of nuisances and dangerous buildings; enforcement through penalties, stop-work orders or other means; or minimum health, sanitation and safety standards for governing the use of structures for housing, *except where the power of municipalities to enact any such regulations is expressly withheld or otherwise provided for by statute.*" (Emphasis added.)).

Although the BCD is authorized to "coordinate, interpret and generally supervise the adoption, administration and enforcement of the state building code," ORS 455.110(1), municipalities can, under certain circumstances, assume responsibility for "the administration and enforcement of a building inspection program." ORS 455.150(1). When a municipality takes on that responsibility to administer a building inspection program, it must appoint a building official to "attend to all aspects of code enforcement, including the issuance of all building permits." ORS 455.150(3).

One of the specialty codes comprising the state building code, and enforced as part of an inspection program, is the Oregon Structural Specialty Code (OSSC), which provides structural standards for building construction. ORS 455.010(9). As relevant here, Chapter 9 of that specialty code is entitled "Fire Protection Systems," and it provides requirements for sprinkler system installation in a variety of commercial buildings.[2]

Apart from and in addition to the requirements imposed by the building code, the State Fire Marshal is granted the authority to enforce all statutes and make rules

---

[2] At the time that the city's ordinance was adopted, the 2010 OSSC was in effect. The 2014 OSSC was later phased in between July 1, 2014, and September 30, 2014, when structures could be designed to meet either the 2014 or the 2010 OSSC. OAR 918-460-0010(3) (July 1, 2014).

relating to the "maintenance and regulation of structural fire safety features in occupied structures and overseeing the safety of and directing the means and adequacy of exit in case of fire" from various buildings except private residences. ORS 476.030(1)(c). However, the State Fire Marshall's regulations cannot require "structural changes" in buildings "built, occupied and maintained in conformity with state building code regulations applicable at the time of construction." ORS 476.030(1)(c). And, even if they relate to structural fire safety features, regulations promulgated by the State Fire Marshall pursuant to ORS chapter 476 are expressly *not* part of the state building code. *See* ORS 455.010(8)(b) (so stating).

The State Fire Marshall, like the BCD, can share enforcement responsibilities with municipalities. Specifically, the State Fire Marshall can exempt a city from state fire regulation if that city has "enacted adequate regulations generally conforming to state and national standards concerning fire prevention, fire safety measures and building construction requirements for safety" and the city "provides reasonable enforcement of its regulations." ORS 476.030(3). In the case of exemption, the State Fire Marshal designates a person or division within the city as "an approved authority for exercising functions relating to fire prevention, fire safety measures and building construction." ORS 476.030(3).

The City of Portland is a municipality that (1) administers specialty code aspects of a building inspection program pursuant to ORS 455.150, including the OSSC, and (2) is exempt from state fire regulation. The city has a building official who administers and enforces the state building code as part of a building inspection program, and it has a City Fire Marshall's Office and its own fire prevention regulations, which are set out in the Portland Fire Code.

With that regulatory background, we turn to the events giving rise to this judicial review. On September 13, 2013, the Portland City Council passed Ordinance No. 186247, which amended the Portland Fire Code. The ordinance, which was enacted after a nightclub fire killed more than 240 people in Brazil earlier that year, mandated that all existing nightclubs in the city with an occupant load of

more than 100 persons have automatic fire sprinkler systems.[3] After the ordinance passed, the City Fire Marshall, Nate Takara, sent letters to affected building and business owners to notify them of the new regulation. The letter also included a deadline for compliance for the particular building or business.

The City Fire Marshall's Office determined that 14 nightclubs potentially would be required to install sprinklers under the ordinance. Tanaka emailed, called, or personally met with some of the building and business owners to discuss the ordinance and assist them with compliance. All 14 nightclubs eventually installed automatic fire sprinklers.

In the fall of 2014, a lobbyist for the Oregon Restaurant & Lodging Association expressed concerns to the BCD about the ordinance. In November 2014, the BCD notified the city that it had been asked "for an interpretation

---

[3] The ordinance provides, in relevant part:

"**SECTION 902**

"**DEFINITIONS**

"NIGHTCLUB. For purposes of Section 903.7, Nightclub means an A-2 occupancy use under the 2009 International Building Code which (a) has areas for dancing or viewing performers; and (b) serves food or drink. 'Nightclub' does not include houses of worship, theaters with fixed seating, banquet halls, or lodge halls.

"**SECTION 903**

"**AUTOMATIC SPRINKLER SYSTEMS**

"**903.7 Nightclubs in Existing Buildings.** Existing nightclubs with an occupant load greater than 100 shall be protected by an approved fire sprinkler system designed and installed in accordance with Section 903.3.1.1 and 903.4 as follows:

"1. Throughout the story containing the nightclub; and

"2. Throughout the stories below the story containing the nightclub; and

"3. In the case of a nightclub located below the level of exit discharge, throughout all stories intervening between that story and the level of exit discharge including the level of exit discharge.

"4. Nightclubs with an occupant load of 200 or greater shall comply with this regulation no later than December 31, 2014.

"5. Nightclubs with an occupant load of 101-199 shall comply with this regulation no later than June 30, 2015."

The ordinance also included findings as to why it was necessary, including that "[w]orldwide experience has shown that a substantial and terrible loss of life occurs when fires break out in nightclubs not protected with automatic fire sprinkler systems."

of the city's ordinance, specifically whether there is a conflict with state law." Thereafter, the BCD informed the city that it had "plenary and exclusive authority" over construction, alteration, and repair of buildings, and that it was investigating whether the city's adoption of the ordinance violated state law.

After that investigation, the BCD issued a "Notice of Proposed Assessment of Civil Penalties, Notice of Proposed Corrective Action, and Notice of Final Order on Default." The notice alleged that the city had violated the state building code by enacting and enforcing the fire sprinkler ordinance, and it proposed to assess a civil penalty of $20,000 for violating ORS 455.020(1) (the preemption statute) and required, as "corrective action," repeal of the ordinance.

The city requested a hearing before an administrative law judge (ALJ), and the parties then filed competing cross-motions for summary determination. The BCD's motion argued that there were no genuine issues of material fact as to whether the city violated the state building code by enacting the ordinance. According to the BCD, the ordinance violated two provisions of the building code: First, the ordinance related to matters encompassed by the state building code (fire sprinkler installation, addressed in Chapter 9 of the OSSC) yet provided different requirements, thereby violating ORS 455.040(1), and second, it required existing nightclubs to be retrofitted with fire sprinkler systems, thereby violating ORS 455.020. The BCD further argued that it had authority under two statutes, ORS 455.770(4) and ORS 455.895(4), respectively, to order the city to repeal its ordinance and to assess a civil penalty.

The city, in its cross-motion, contended that the BCD had no jurisdiction over the city's enactment of its ordinance and had no statutory authority to order the city to repeal an ordinance or impose a civil penalty for enacting an ordinance. According to the city, the BCD had acted *ultra vires* by using code oversight powers—intended to be limited to investigating and correcting any local code enforcement, certification, and permitting issues—to scrutinize the city's lawmaking and fire prevention activities. And, on the merits of the preemption question, the city argued that

home-rule ordinances are valid unless unambiguously pre-empted—a standard that the BCD could not satisfy, considering the different reach of building code standards and fire safety standards. Alternatively, the city argued that, if its ordinance were expressly and unambiguously preempted by ORS 455.040, the statute would be unconstitutional in light of the home-rule provisions in the Oregon Constitution.[4]

The ALJ largely agreed with the city, both regarding the scope of the BCD's authority and on the merits of the preemption issues. As for the BCD's motion for summary determination, the ALJ ruled that, viewing the evidence in the light most favorable to the city as the nonmoving party, the BCD had failed to establish that the ordinance was preempted by the state building code. Essentially, the ALJ concluded that the building code standards apply only at the time of construction or when a building is undergoing alteration, reconstruction, or major structural repair, whereas fire standards continuously apply to all constructed buildings except private residences. Therefore, as long as the ordinance applied only to existing buildings not undergoing construction—and, assuming for summary determination purposes, that the sprinkler systems would not require any "structural changes" in violation of ORS 476.030(1)—they would not be inconsistent with or preempted by the state building code.

On the city's cross-motion, the ALJ concluded that the BCD lacked statutory authority to impose a civil penalty or order the repeal of the city's ordinance. The ALJ reasoned that the BCD's statutory authority to direct a municipality to impose a civil penalty or take corrective action is limited to matters related to the enforcement of the building code and administration of its building inspection program. For that reason, the ALJ concluded that the BCD lacked authority to take the actions proposed in its notice, and so the notice should be dismissed.

The BCD disagreed with the ALJ's proposed order and modified it in various respects. *See* ORS 183.650 (setting

_____

[4] The city also advanced additional arguments that are not relevant to our discussion or disposition.

forth the process for ALJs to prepare and serve recommended findings of fact and conclusions of law on the parties and agency, and for the agency to then modify that proposed order before entering it); OAR 137-003-0655(6) ("The agency may adopt the proposed order as the final order, or modify the proposed order and issue the modified order as the final order."). The BCD took a far more expansive view of its jurisdiction over municipalities and its statutory authority to penalize or correct a municipality's enactment of an ordinance, and it reached different conclusions as to whether the city's ordinance violated the state building code. With regard to its jurisdiction and authority to impose civil penalties, the BCD concluded:

> "ORS 455.895(4) provides the Division authority to assess civil penalties of not more than $25,000 against a public body that is responsible for administering and enforcing a building inspection program. This authority is capped at the $25,000 amount, but not limited to any particular violation or set of violations. The Division, therefore, has the authority to assess a civil penalty of not more than $25,000 against the City for its violations of ORS 455.040(1) and 455.020(1)."

(Footnote omitted.)

With regard to its jurisdiction and authority to order the city to repeal the ordinance, the BCD relied on ORS 455.770. That statute, the BCD concluded, represented a broad grant of authority to the BCD to order corrective action whenever "'there is a failure to enforce or a violation of any provision of the state building code or *** this chapter.'" Thus, when the "violation at issue is the unlawful enactment of an ordinance, the action correcting the enactment is repeal of the Ordinance, which is the corrective action the Division has ordered the city to take."

After concluding that it had authority to take action against the city for adopting and enforcing the ordinance, the BCD proposed a penalty of $8,750 and ordered the city "to take the corrective action of repealing Ordinance No. 186247." The city filed exceptions to that amended proposed order, but the BCD issued a final order that was substantially the same as its amended proposed order.

The city seeks judicial review of that final order. In its first assignment, the city argues that the ALJ correctly determined that the BCD lacked the necessary authority to bring this type of proceeding against the city. We limit our discussion to that assignment of error, because we agree that the BCD was not statutorily authorized to bring an enforcement proceeding against the city to impose penalties and order the repeal of the ordinance.

It is well established that state agencies are "creatures of statute," and that, in the absence of a constitutional provision concerning their function and authority, they "derive their authority from (1) the enabling legislation that mandates that particular agency's function and grants powers, and (2) from general laws affecting administrative bodies." *City of Klamath Falls v. Environ. Quality Comm.*, 318 Or 532, 545, 870 P2d 825 (1994) (internal citations and quotation marks omitted). The question before us, then, is whether the legislature authorized the BCD to bring an action against a city to impose penalties for the enactment and enforcement of an ordinance or to compel its repeal. *See Diack v. City of Portland*, 306 Or 287, 293, 759 P2d 1070 (1988) (an agency's "'[j]urisdiction' depends on whether the matter is one that the legislature has authorized the agency to decide"). To resolve that question, "we turn to an analysis of the pertinent statutes, because an agency has only those powers that the legislature grants and cannot exercise authority that it does not have." *SAIF v. Shipley*, 326 Or 557, 561, 955 P2d 244 (1998).

The BCD relies on two statutes, ORS 455.770 and ORS 455.895, for its authority to bring this enforcement action against the city. The first of those statutes, ORS 455.770, provides, in pertinent part:

"(1)  In addition to any other authority and power granted to the Director of the Department of Consumer and Business Services under [enumerated statutes], with respect to municipalities, building officials and inspectors, if the director has reason to believe that there is a failure to enforce or a violation of any provision of the state building code or ORS 446.003 to 446.200, 446.225 to 446.285, 446.395 to 446.420, 479.510 to 479.945, 479.995 or 480.510

to 480.670 or this chapter or ORS chapter 447, 460 or 693 or any rule adopted under those statutes, the director may:

"(a) Examine building code activities of the municipality;

"(b)  Take sworn testimony; and

"(c)  With the authorization of the Office of the Attorney General, subpoena persons and records to obtain testimony on official actions that were taken or omitted or to obtain documents otherwise subject to public inspection under ORS 192.311 to 192.478.

"(2)  The investigative authority authorized in subsection (1) of this section covers the violation or omission by a municipality related to enforcement of codes or administrative rules, certification of inspectors or financial transactions dealing with permit fees and surcharges under any of the following circumstances when:

"(a)  The duties are clearly established by law, rule or agreement;

"(b)  The duty involves procedures for which the means and methods are clearly established by law, rule or agreement; or

"(c)  The duty is described by clear performance standards.

"* * * * *

"(4)  If the Department of Consumer and Business Services or the director directs corrective action, the following shall be done:

"(a)  The corrective action shall be in writing and served on the building official and the chief executive officers of all municipalities affected;

"(b)  The corrective action shall identify the facts and law relied upon for the required action; and

"(c)  A reasonable time shall be provided to the municipality for compliance."

According to the BCD, it had broad investigative authority under subsection (1) to determine whether the city violated the state building code by enacting the ordinance, and its authority to order corrective action under

subsection (4) "as a consequence of investigation under ORS 455.770(1) is necessarily coextensive to the [BCD]'s investigative authority." The city, on the other hand, argues that the investigative authority set forth in ORS 455.770(1), and any consequent "corrective action" under subsection (4), is limited by subsection (2) of the statute to clear violations or omissions related to enforcement of codes or administrative rules, certification of inspectors, or financial transactions dealing with permit fees and surcharges—a limitation that is inconsistent with the BCD's claim that it can investigate and order repeal of the city's enactment of its ordinance.

Thus, the crux of the parties' dispute about the breadth of the BCD's authority in this case turns on the interplay between subsections (1) and (2) of the statute. Specifically, the parties disagree as to whether ORS 455.770(2) limits the investigatory authority set out in ORS 455.770(1), which is the city's position, or whether subsection (1) can be read as a broad grant of authority that extends beyond the limitations in subsection (2), which is the BCD's position.

In light of the text, context, and legislative history of ORS 455.770, we agree with the city that subsection (2) was intended as a substantive limitation on the BCD's investigative authority regarding municipalities. The text, in isolation, is somewhat ambiguous on the question. Subsection (2) refers to what the "investigative authority authorized in subsection (1) of this section *covers*" (emphasis added), which the legislature could have intended inclusively or exclusively. *See Webster's Third New Int'l Dictionary* 524 (unabridged ed 2002) (defining "cover" to mean "have width or scope enough to include or embrace" and "to comprise, include, or embrace in an effective scope of treatment or operation").

But we generally do not read text in isolation. *Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) ("[T]ext should not be read in isolation but must be considered in context."). Rather, we look to its surrounding context, which in this case leaves little doubt that the legislature understood subsection (2) to operate as a limitation on the BCD's investigative authority under subsection (1).

To begin with, ORS 455.770 must be understood in the broader context of ORS chapter 455—and, specifically, why municipalities are singled out in the first place for investigation and corrective action regarding "code enforcement" and building code violations. As described at the outset, a municipality can assume the responsibility to administer a building inspection program, whereby it must appoint a building official to "attend to all aspects of code enforcement, including the issuance of all building permits." ORS 455.150(3). ORS chapter 455 includes dozens of provisions that relate to municipal building inspection programs, the way those programs are enforced, and the relationship between local building officials and the BCD. *See, e.g.*, ORS 455.148 - 455.200; ORS 455.465 - 455.471; ORS 455.740. In fact, the legislature has specifically defined the term "[m]unicipality" for purposes of ORS chapter 455 in relation to authority to administer a building code: "Municipality means a city, county or other unit of local government *otherwise authorized by law to administer a building code.*" ORS 455.010(5) (emphasis added).

Given that context, the grant of authority in ORS 455.770(1) for the BCD to investigate with "respect to municipalities, building officials and inspectors" is not plausibly understood as an open-ended grant of authority to investigate a municipality acting in *any* capacity that touches on the building code; rather, it is more plausibly read as a grant of authority to carry out the BCD's supervision of a municipality's role in administering a building code within the meaning of ORS chapter 455—consistently with how subsection (2) describes authority covering a "violation or omission by a municipality related to enforcement of codes or administrative rules, certification of inspectors or financial transactions dealing with permit fees and surcharges."

That reading of the statute—that subsection (2) is coextensive with the investigatory authority described by subsection (1)—also makes more sense in terms of how subsection (2) is worded. Each of the circumstances listed in subsection (2) that must be present for the BCD to exercise its investigative authority imposes a heightened standard for the BCD to exercise its authority relating to a

municipality: "the duties are *clearly established* by law, rule or agreement," the "duty involves procedures for which the means and methods are *clearly established* by law, rule or agreement," or the "duty is described by *clear performance standards*." ORS 455.770(2) (emphases added). The BCD posits that ORS 455.770(2) was intended to impose those "additional requirements for the BCD's investigation of particular types of issues" but not other types of issues that might fall under what the BCD claims is its more "general investigative authority" under ORS 455.770(1). But the BCD has not proffered any plausible explanation for why the legislature would have contemplated imposing heightened requirements for things like code enforcement, which is the bailiwick of the BCD, but granting broad authority to address other municipal actions (such as enactment of ordinances) that merely touch on the building code. At least on the face of the statute, there is no obvious reason why the legislature would have imposed heightened standards for investigation of municipalities based on some types of municipal action but not others.

        The unusual posture of this case—a state agency investigating a city for the legislative act of adopting an ordinance—demonstrates just how improbable it is that the legislature would have intended to create a less rigorous test for "general investigative authority" under subsection (1) than the "clear" standards requirements of subsection (2). In general, Oregon cities have home-rule authority under the state constitution to regulate to the extent provided in their charters, and those provisions "provide authority for the people of a city to determine the organization, and to define the powers, of their local government without first having to obtain authorization from the state legislature." *Springfield Utility Board v. Emerald PUD*, 339 Or 631, 647, 125 P3d 740 (2005). "Under a city's home-rule authority, the validity of local action depends, first, on whether it is authorized by the local charter or by a statute, and second, on whether it contravenes state or federal law." *Kramer v. City of Lake Oswego*, 365 Or 422, 448, 446 P3d 1, *opinion adh'd to as modified on recons*, 365 Or 691, 455 P3d 922 (2019) (internal citation and quotation marks omitted).

With that constitutional backdrop, it is hard to imagine why the legislature would have intended to create the bifurcated authority envisioned by the BCD, with a lower threshold for an investigation of a city's legislative actions than for a building official's decision not to enforce part of the state building code. Even more implausible is that, despite home-rule authority, the legislature intended to give the BCD the power to decide, through an enforcement proceeding, whether a city ordinance contravenes state or federal law, and to then order the repeal of that ordinance as a "corrective action."[5]

To the extent that there is any doubt about that, the legislative history of the statute confirms what the text and context suggest: It was never intended to grant sweeping investigative authority that would reach beyond the BCD's oversight of a municipality's acts or omissions in code enforcement and administering a building inspection program. The relevant provisions of ORS 455.770 were enacted in 1991 as part of Senate Bill 132. Or Laws 1991, ch 792, § 2. During a work session on the bill, the BCD's administrator, Gary Wicks, addressed lawmakers' concerns about the breadth of the investigatory powers given to the BCD— including concerns that the bill was centralizing power that could be abused. Minutes, Senate Committee on Judiciary, SB 132, May 1, 1991, 3 (describing testimony of Gary Wicks, Administrator of Oregon Building Codes Agency). Wicks represented that subsection (2) of the bill restricted the BCD's authority and provided testimony to the effect that the areas the agency can look at are limited to the enforcement of codes or administrative rules, use of certified inspectors, and review of financial transactions dealing with permit fees and surcharges. *Id*. Similarly, before a House Committee, Wicks represented that all of the agency's powers are limited

---

[5] Article III, section 1, of the Oregon Constitution provides that "[t]he powers of the Government shall be divided into three separate branches, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these branches, shall exercise any of the functions of another, except as in this Constitution expressly provided." Because we conclude that the legislature did not intend to give the BCD the power to impose penalties or order repeal of a city ordinance, we need not address any separation of powers questions that might arise from a more expansive grant of authority to the BCD in that respect.

to enforcement of codes or administrative rules, the use of inspectors and the review of financial transactions dealing with permit fees and surcharges. Minutes, House Committee on Housing and Urban Development, SB 132, May 28, 1991, 3 (describing testimony of Gary Wicks).

Based on the text, context, and history of the statute, we conclude that the only plausible understanding of ORS 455.770 is that the investigative authority described in subsections (1) and (2) of the statute are coextensive, and the BCD's authority to investigate a municipality is limited to violations or omissions by the municipality in the enforcement of codes or administrative rules, certification of inspectors, or financial transactions dealing with permit fees and surcharges under the circumstances described in ORS 455.770(2)(a) through (c). The statute does not authorize investigation of a city for enacting an ordinance, let alone authorize the BCD to order the repeal of the ordinance as a "corrective action" as part of the BCD's investigation. The BCD erred in concluding otherwise.

We next turn briefly to the second statute on which the BCD relies, ORS 455.895. That statute provides, in relevant part:

"(2)   The Department of Consumer and Business Services, or an appropriate advisory board, if any, may at its discretion impose a civil penalty against any person who violates the state building code or ORS 446.003 to 446.200, 446.225 to 446.285, 446.395 to 446.420, 446.566 to 446.646, 446.666 to 446.746, 479.510 to 479.945, 479.950 or 480.510 to 480.670, or this chapter or ORS chapter 447, 460 or 693, or any rule adopted or order issued for the administration and enforcement of those statutes. Except as provided in subsections (3), (4) and (9) of this section or ORS 446.995, a civil penalty imposed under this section must be in an amount determined by the appropriate advisory board or the department of not more than $5,000 for each offense or, in the case of a continuing offense, not more than $1,000 for each day of the offense.

"* * * * *

"(4)   The department may impose a civil penalty of not more than $25,000 against a public body responsible for administering and enforcing a building inspection

program. As used in this subsection, 'public body' has the meaning given that term in ORS 174.109."

ORS 455.895.

For reasons similar to those discussed above, we are not persuaded by the BCD's contention that ORS 455.895 operates as an independent grant of authority for the BCD to impose a civil penalty on a municipality for the enactment and enforcement of an ordinance. Contextually, the civil penalty provision must be read in light of the BCD's investigatory and enforcement powers with regard to municipalities. As ORS 455.895(4) indicates, the legislature understood the BCD's civil penalty authority with regard to municipalities to flow from the fact that the public body is "responsible for administering and enforcing a building inspection program," and ORS 455.770(2) restricts the BCD's investigatory authority with regard to a municipality's acts and omissions, as previously explained. ORS 455.895 does not separately authorize the BCD to bring an enforcement action or impose a penalty against the City of Portland for enacting and enforcing an ordinance that amended its fire code.

In sum, we agree with the city's arguments and the ALJ's conclusion that the BCD lacked the authority to bring this action for penalties and repeal of the city's ordinance. For that reason, we reverse the final order.

Reversed.