Argued and submitted June 12, 1987, part of director's order redetermining priorities within ground water area vacated; otherwise affirmed July 6, reconsideration allowed by opinion October 12, 1988
See 93 Or App 352, 762 P2d 330 (1988)

## DOHERTY et al,
*Petitioners,*

*v.*

## OREGON WATER RESOURCES DIRECTOR et al,
*Respondents.*

(CA A40087)

758 P2d 865

Larry A. Sullivan, Vale, argued the cause for petitioners. With him on the briefs was William F. Schroeder, Vale.

Philip Schradle, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Petitioners challenge the Water Resources Director's[1] amended order designating 274 square miles near Hermiston as a "critical ground water area," pursuant to ORS 537.735.[2] The Director also divided the critical area into six

---

[1] In 1985, the legislature made major changes in the statutes governing the administration of ground water resources, including the abolition of the Water Policy Review Board and the creation of the Water Resources Commission. The statutes governing critical ground water area determination proceedings were amended to place the power and authority to conduct such proceedings in the Water Resources Commission rather than in the Water Resources Director. *See* Or Laws 1985, ch 673, §§ 55, 62, 63. The changes do not apply to this proceeding. Or Laws 1985, ch 673, § 175. With one exception, ORS 536.075, (Or Laws 1985, ch 673, § 9), all statutory references in this opinion are to the sections as they existed before the 1985 revisions.

[2] ORS 537.735 provided:

"(1) If, at the conclusion of the public hearing held under ORS 537.730, the Water Resources Director finds that any of the circumstances set forth in ORS 537.620(3) and (4) if the proceeding is initiated thereunder, or in ORS 537.730(1) if the proceeding is initiated thereunder, are true, and further finds that the public welfare, health and safety require that any one or more corrective controls be adopted, the director shall by order declare the area in question to be a critical ground water area.

"(2) The order of the director shall define the boundaries of the critical ground water area and shall indicate which of the ground water reservoirs located within the area in question are included within the critical ground water area. Any number of ground water reservoirs which either wholly or partially overlie one another may be included within the same critical ground water area.

"(3) If the order is based completely or in part on actual or likely interference between ground water users and geothermal resources regulated under ORS chapter 522, the order shall demonstrate consideration of any orders or permits applicable to the reservoir issued by the governing board or State Geologist of the State Department of Geology and Mineral Industries under ORS chapter 522.

"(4) The order of the director may include any one or more of the following corrective control provisions:

"(a) A provision closing the critical ground water area to any further appropriation of ground water, in which event the director shall thereafter refuse to accept any application for a permit to appropriate ground water located within such critical area.

"(b) A provision determining the permissible total withdrawal of ground water in the critical area each day, month or year, and, in so far as may be reasonably done, the director shall apportion such permissible total withdrawal among the appropriators holding valid rights to the ground water in the critical area in accordance with the relative dates of priority of such rights.

"(c) A provision according preference, without reference to relative priorities, to withdrawals of ground water in the critical area for residential and livestock watering purposes first. Thereafter the director may authorize withdrawals of ground water in the critical area for other beneficial purposes, including agricultural, industrial, municipal other than residential, and recreational purposes, in such order as the director deems advisable under the circumstances, so long as such withdrawal will not materially affect a properly designed and

subareas for management purposes and ordered that the withdrawal of water in the subareas be in accordance with the relative priorities of appropriations within the subareas. We review this matter as provided in ORS 183.482. ORS 536.075(2) and (3). Petitioners raise several issues with respect to the establishment of the critical ground water area and also challenge the order on the ground that it unlawfully reestablishes priorities for ground water withdrawal. We vacate the part of the order purporting to reorder water priorities; otherwise we affirm.

The Columbia River Basalt Group is a thick series of accordantly layered basaltic lavas that form a broad plain covering more than 50,000 square miles of Oregon, Washington and Idaho. The Umatilla Structural Basin occupies approximately 2500 square miles of the Columbia River Basalt Group from Arlington east to Athena-Weston and from the Columbia River south to the crest of the Blue Mountains. The proposed critical area lies in the north central portion of the Umatilla Structural Basin. The Director's order determined, pursuant to ORS 537.735 and ORS 537.730,[3] that

---

operating well with prior rights that penetrates the aquifer.

"(d) A provision reducing the permissible withdrawal of ground water by any one or more appropriators or wells in the critical area.

"(e) Where two or more wells in the critical area are used by the same appropriator, a provision adjusting the total permissible withdrawal of ground water by such appropriator, or a provision forbidding the use of one or more of such wells completely.

"(f) A provision requiring the abatement, in whole or in part, or the sealing of any well in the critical area responsible for the admission of polluting materials into the ground water supply or responsible for the progressive impairment of the quality of the ground water supply by dispersing polluting materials that have entered the ground water supply previously.

"(g) A provision requiring and specifying a system of rotation of use of ground water in the critical area.

"(h) Any one or more provisions making such additional requirements as are necessary to protect the public welfare, health and safety in accordance with the intent, purposes and requirements of ORS 537.505 to 537.795.

"(5) As used in this section, 'residential purposes' means:

"(a) Single family residence use, including watering lawns or noncommercial gardens one-half acre or less in size, in an amount not to exceed 5,000 gallons per day; or

"(b) Use by a dwelling owner or tenant who is billed by a municipality for water received at the dwelling."

[3] ORS 537.730 provided, in part:

"(1) In addition to initiation under ORS 537.620(3) and (4) of a proceeding

the ground water level in the critical area was declining excessively, that the ground water supply was about to be overdrawn and that the interests of public welfare, health and safety required the establishment of the Butter Creek Critical Ground Water Management Area.

■ Petitioners assign error to the Director's decision to treat this proceeding as a continuation of hearings held in 1976 and 1978 concerning the same proposed critical ground water area and his admitting evidence of the entire record of those hearings. We are satisfied that petitioners received notice of the Director's intention to incorporate the previous hearings' records into the record of the 1984 hearing, that, although petitioners did not participate in the earlier hearings, they had adequate opportunity to review the records of those hearings in advance of the 1984 hearing and that they were not prejudiced by the inclusion of the earlier hearing records in the record of this proceeding. We conclude that the Director could properly incorporate the records of the previous hearings in this proceeding.[4]

■ Petitioners contend that the Director erred as a matter of law in describing the boundaries of the ground water area. ORS 537.735(2) provides:

"The order of the commission shall define the boundaries of the critical ground water area and shall indicate which of the ground water reservoirs located within the area in question are included within the critical ground water area. Any number of ground water reservoirs which either wholly or partially overlie one another may be included within the same critical ground water area."

for the determination of a critical ground water area, the Water Resources Director upon the director's own motion or, in the director's discretion, upon receipt of a petition therefor from the State Geologist of the State Department of Geology and Mineral Industries or any ground water claimant or appropriator within the area in question, may also initiate such a proceeding whenever the director has reason to believe that:

"(a) Ground water levels in the area in question are declining or have declined excessively.

"* * * * *

"(d) The available ground water supply in the area in question is being or is about to be overdrawn."

[4] Petitioner's only argument in support of this assignment is contained in its "statement of the case." We consider it only because respondents answer the assignment.

Petitioners contend that that subsection requires that a critical ground water area contain an entire ground water reservoir. Here, the primary reservoir is an underground lake within the Columbia River Basalt Group. We do not agree that ORS 537.735(2) requires that the entire 50,000 square miles of that reservoir be within the designated critical area. There is no requirement that a critical ground water area contain an entire reservoir. It is sufficient that the boundaries of the area can be defined and that the Director indicates which reservoirs are contained within it.

■     Implicitly, however, the boundaries must define an area that is susceptible to management and control. ORS 537.735(1). Petitioners contend that there is no substantial evidence to support the Director's determination that the Butter Creek Management Area has such boundaries. We conclude that Ground Water Report No. 30 supports the Director's finding that the critical area has geological features which permit the approximation of exterior boundaries of naturally occurring impediments to ground water movement, thereby enabling management and control of the area. The same evidence supports the Director's division of the area into six management subareas, because it shows that the natural impediments to ground water movement tend to minimize the hydraulic effects between the wells located within the different areas.

The Director is authorized to establish corrective controls if he determines that the ground water supply is about to be "overdrawn" or if ground water levels are declining or have declined "excessively," and if he further finds that the public welfare, health and safety require such controls. ORS 537.735. The Director found "overdrafting" and an "excessive decline" of water levels. The quoted terms are not defined in the statutes, but the Director defined them in his order:

"Overdrawing (overdrafting) of the ground water reservoir occurs when the annual withdrawal of water from the ground water reservoir, together with any natural discharge from the ground water reservoir, is in excess of the natural occurring annual recharge to the ground water reservoir.

"Overdrafting of the ground water reservoir on a year-to-year basis results in a progressive lowering of the static water level (or potentiometric head), measured at the time of the year

that maximum recovery of the ground water reservoir has occurred.

"Progressive lowering (decline) of the static water level (potentiometric head) in the ground water reservoir beyond the level necessary to provide the capacity to accept available annual natural recharge constitutes excessive decline."

Petitioners argue that the legislature has delegated to the Director the responsibility and discretion for developing a specific policy for the application of the terms "overdrawn" and "excessive" within the legislature's general policy stated in ORS 537.525[5] and that they are therefore "delegative" terms, the standards for which, it is contended, cannot be developed on a case-by-case basis but must be set out in

---

[5] ORS 537.525 provided:

"The Legislative Assembly recognizes, declares and finds that the right to reasonable control of all water within this state from all sources of water supply belongs to the public, and that in order to insure the preservation of the public welfare, safety and health it is necessary that:

"(1) Provision be made for the final determination of relative rights to appropriate ground water everywhere within this state and of other matters with regard thereto through a system of registration, permits and adjudication.

"(2) Rights to appropriate ground water and priority thereof be acknowledged and protected, except when, under certain conditions, the public welfare, safety and health require otherwise.

"(3) Beneficial use without waste, within the capacity of available sources, be the basis, measure and extent of the right to appropriate ground water.

"(4) All claims to rights to appropriate ground water be made a matter of public record.

"(5) Adequate and safe supplies of ground water for human consumption be assured, while conserving maximum supplies thereof for agricultural, commercial, industrial, recreational and other beneficial uses.

"(6) The location, extent, capacity, quality and other characteristics of particular sources of ground water be determined.

"(7) Reasonably stable ground water levels be determined and maintained.

"(8) Depletion of ground water supplies below economic levels, impairment of natural quality of ground water by pollution and wasteful practices in connection with ground water be prevented or controlled within practicable limits.

"(9) Whenever wasteful use of ground water, impairment of or interference with existing rights to appropriate surface water, declining ground water levels, interference among wells, overdrawing of ground water supplies or pollution of ground water exists or impends, controlled use of the ground water concerned be authorized and imposed under voluntary joint action by the Water Resources Director and the ground water users concerned whenever possible, but by the director under the police power of the state when such voluntary joint action is not taken or is ineffective.

"(10) Location, construction, depth, capacity, yield and other characteristics of and matters in connection with wells be controlled in accordance with the purposes set forth in this section."

administrative rules. *Springfield Education Assn. v. School Dist.,* 290 Or 217, 228, 621 P2d 547 (1980). Respondents assert that "overdrawn" and "excessive" are "inexact" or "interpretive" terms to which the legislature has given a "complete meaning," subject to agency interpretation, which, they contend, can be accomplished through adjudication. *Springfield Education Assn. v. School Dist., supra,* 290 Or at 224.

Whether the terms are "delegative" or "inexact" depends largely on the nature of the terms themselves, which are basically descriptive and inherently suggest the exercise of a certain degree of judgment based on evidence in a given case.

In determining whether the legislature intended for the Director to develop policy in the application of the terms, it is helpful, additionally, to examine the role of the Director in the administration of the Ground Water Act. The law creating the office empowered and required the Director to "perform duties, functions and powers delegated to him by the Board, *subject to policy direction by the Board."* ORS 536.032(2). (Emphasis supplied.) A review of ORS 537.780[6]

---

[6] ORS 537.780 provided:

"In the administration of ORS 537.505 to 537.795, the Water Resources Director may:

"(1) Require that all flowing wells be capped or equipped with valves so that the flow of ground water may be completely stopped when the ground water is not actually being applied to a beneficial use.

"(2) Prescribe and enforce general standards for the construction and maintenance of wells and their casings, fittings, valves and pumps, and special standards for the construction and maintenance of particular wells and their casings, fittings, valves and pumps.

"(3) Prescribe and enforce uniform standards for the scientific measurement of water levels and of ground water flowing or withdrawn from wells.

"(4) Enter upon any lands for the purpose of inspecting wells, including wells exempt under ORS 537.545, casings, fittings, valves, pipes, pumps and measuring devices.

"(5) Prosecute actions and suits to enjoin violations of ORS 537.505 to 537.795, and appear and become a party to any action, suit or proceeding in any court or before any administrative body when it appears to the satisfaction of the director that the determination of such action, suit or proceeding might be in conflict with the public policy expressed in ORS 537.525.

"(6) Call upon and receive advice and assistance from the Environmental Quality Commission or any other public agency or any person, and enter into cooperative agreements with any such public agency or person.

"(7) Promulgate and enforce such rules as the director deems necessary to facilitate and assist in carrying out functions under ORS 537.505 to 537.795. Such

indicates that the primary function of the Director was administrative. It included the power to require that all wells be capped or equipped with valves, to prescribe standards for the construction of wells, to prescribe and enforce uniform standards for scientific measurement of water levels and of ground water flowing or withdrawn from wells, to inspect wells and to prosecute or become a party to actions relevant to the policies stated in ORS 537.525. The Board, not the Director, was the primary policymaker for the water resources administration.

■ The statutes indicate an intention by the legislature to express a completed policy. *Springfield Education Assn. v. School Dist., supra,* 290 Or at 224. The general policy of the Ground Water Act is that there be reasonable public control of all water in the state for the preservation of the "public welfare, safety and health." ORS 537.525. That policy is to be accomplished through: (1) the beneficial use of ground water without waste, within the capacity of available sources, ORS 537.525(3); (2) the preservation of adequate and safe supplies of ground water for human consumption, ORS 537.525(5); (3) the preservation of reasonably stable ground water levels, ORS 537.525(7); and (4) the prevention of the depletion of ground water supplies below economic levels, the impairment of natural water quality, and wasteful practices. ORS 537.525(8). The legislature thus provided explicit guidance for the implementation of its general policy. Within that framework, the Director must determine whether, in a specific case, the ground water supply is about to be overdrawn or ground water levels are declining excessively. ORS 537.730(1). That determination calls for the exercise of administrative expertise and judgment based on information derived from experts.

---

rules include, but are not limited to rules governing:

"(a) The form and content of registration statements, certificates of registration, applications for permits, permits, certificates of completion, ground water right certificates, notices, proofs, maps, drawings, logs and licenses;

"(b) Procedure in hearings held by the director or an authorized assistant; and

"(c) The circumstances under which the helpers of persons operating well drilling machinery may be exempt from the requirement of direct supervision by a licensed water well constructor.

"(8) In accordance with applicable law regarding search and seizure, apply to any court of competent jurisdiction for a warrant to seize any well drilling machine used in violation of ORS 537.747 to 537.753."

It also requires the Director to decide whether, under a given set of facts, the criteria of ORS 537.525 are implicated. We conclude that that process involves the interpretation and application, not the development and refinement, of completed legislative policy. The terms, therefore, are "inexact." *Springfield Education Assn. v. School Dist., supra,* 290 Or at 224.

Our conclusion does not resolve the question of whether the Director was required to make pre-adjudicative rules setting forth standards for the application of the terms. *Trebesch v. Employment Division,* 300 Or 264, 269, 710 P2d 136 (1985). Another relevant factor is the "breadth of potential administrative choice to develop and execute the terms." *Trebesch v. Employment Division, supra,* 300 Or at 269. Here, the need for rules is reduced substantially, because the criteria stated in ORS 537.525 are clear guides to the Director in his determination.

The Director is authorized to promulgate rules to carry out his functions, including rules for the form and content of registration statements, certificates, licenses and permits and proceedings for hearings. ORS 537.780. The existence of that authority does not dictate, as petitioners contend, that the Director adopt rules for every function. *See Trebesch v. Employment Division, supra,* 300 Or at 274.

Until recent legislative changes, the Director had extensive adjudicative responsibilities for the determination of ground water priorities and critical ground water areas. ORS 537.730; ORS 537.735; ORS 537.740. The authority to determine when water withdrawal is "excessive" and when the water supply is being "overdrawn" is a responsibility expressly included within that function. The terms lend themselves to adjudication by virtue of the extensive fact-gathering and expertise necessary to a determination. The centralized nature of the adjudicative process ensures that the Director's application of the legislature's policies will be "coordinated" and "integrated," as required by ORS 536.220(2). We hold that the Director was not required to develop pre-adjudicative

rules for the application of the terms "excessive" and "overdrawn." *See Trebesch v. Employment Division, supra,* 300 Or at 274.[7]

Petitioners dispute the Director's definitions of the terms "excessive" and "overdrawn," contending that he has neglected to consider economic factors, as required by ORS 537.525(8). They argue that the evidence shows that ground water is not renewable in the critical area, because the water that feeds it does not reach it for many thousands of years. Therefore, they assert, the Director could treat the area in question as a "non-rechargeable aquifer," a "stock resource," to be depleted within economic levels based on a determination of the economic life of the reservoir. There is no evidence, petitioners argue, of the economic life and, therefore, no basis on which to decide whether water is being overdrawn.

■   Although ORS 537.525(8) requires the Director to *prevent* the depletion of ground water supplies below economic levels, it does not require the Director to *allow* the depletion of water until that level is reached or to authorize "ground water mining," the total depletion of the resource, as petitioners suggest. The Director made no determination whether ground water supplies could be depleted further and still be within economic levels. We conclude, however, that the policy expressed in ORS 537.525 does not require such a determination before an area may be subject to control and management under ORS 537.735. Other considerations may necessitate the implementation of controls before economic concerns need to be addressed. ORS 537.525(3) requires that the "basis, measure and extent of the right to appropriate ground water" be "[b]eneficial use without waste, *within the capacity of available sources.*" (Emphasis supplied.) ORS 537.525(7) requires that "[r]easonably stable ground water levels be determined and maintained." The Director's definitions of the terms "excessive" and "overdrawn" are consistent with those requirements and are not inconsistent with the other criteria set out in ORS 537.525 for the implementation of the legislature's policy. His determination that controls

---

[7] Contentions analogous to petitioners' regarding the need for "fair notice" have been previously considered by the Supreme Court, *see Andersen v. Peden,* 284 Or 313, 327, 587 P2d 59 (1978); *Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980), and are rejected.

were necessary to ensure use of water within the capacity of available resources and to protect adequate supplies of water for domestic, livestock and other beneficial uses, *see* ORS 537.525(5), was a permissible application of the legislative policy and we will not disturb it. We also hold that the evidence supports the Director's finding of a long-term, excessive decline in ground water levels.

■　　　Petitioners contend that, in addition to determining that water levels are declining excessively or that the supply is about to be overdrawn, the Director must explain the policy to support the conclusion that controls are necessary to satisfy public welfare, health and safety. ORS 537.735(1). The Director's order expresses the rationale that, because the decline of water levels below the capacity of available sources could threaten the availability of water for domestic and stock use, the preservation of the public welfare, safety and health requires the institution of corrective controls. In the light of the Director's findings regarding the potential effects of declining water levels, he was required to institute controls if it was necessary and possible to do so to protect the public welfare, safety and health. That is a conclusion required by the *legislature's* policy, ORS 537.525, not the Director's, and we reject the contention that the Director was required to explain it further. We also conclude that the Director's determination that corrective controls are necessary follows rationally from his findings of excessive decline in ground water levels and an overdrawing of the water supply.

■■　　　Petitioners contend that the Director did not comply with the notice provisions of ORS 183.415(2)(c), because the hearing notice did not specify that the Director intended to rely in part on ORS 537.730(1)(d) in evaluating the proposed critical area and, therefore, he is barred from relying on subsection (1)(d) as a basis for a critical ground water area determination. The notice provided:

> "Based on data collected, the Director believes the ground water levels in the area in question are declining or have declined excessively * * *."

That is a reference to ORS 537.730(1)(a). Additionally, the notice expressly referred to all of ORS 537.730:

> "The Director of the Water Resources Department or his authorized assistant will receive any pertinent evidence in

favor of or opposed to the determination of a critical ground water area as provided in ORS 537.730, 537.735 and 537.740."

The relationship of subsections (1)(a) and (1)(d) is obvious. Additionally, there is no evidence that petitioners were prejudiced by the Director's failure to refer expressly to subsection (1)(d). *See* ORS 183.482(7). We conclude that the omission was not material and that the notice was adequate to advise petitioners fairly of the provisions on which the Director would rely in making the critical ground water area determination.

The Director's order establishes the critical ground water area and six subareas. It further orders

"that withdrawal of water from the basalt ground water reservoir within a subarea of the Butter Creek Critical Ground Water Area for uses not set forth in ORS 537.545, as authorized herein, shall be in accordance with the relative priorities for appropriation within the subarea within which the well is located."

That order, together with the Director's findings, which contain a table setting forth the priorities within each subarea, appear to reestablish priorities for the critical ground water area. This proceeding, however, is not one to establish priorities under ORS 537.670 to ORS 537.700. If it were, it would be subject to the provisions of ORS 537.670, which requires notice that the Director will take "testimony as to the rights of the various claimants to appropriate the ground water." ORS 537.670(2). That notice was not given here. Additionally, the establishment of priorities is not one of the control measures expressly authorized by ORS 537.735(4). In view of the existence of a separate procedure for the determination of water priorities, we conclude that a determination of priorities cannot be made pursuant to the "catchall" control and management provision of ORS 537.735, but must comply with the separate procedures set out in ORS 537.670 to ORS 537.700.

The part of the Director's order redetermining priorities within the critical ground water area is vacated; otherwise affirmed.