Argued and submitted March 9, the decision of the Court of Appeals affirmed and order of Oregon Water Resources Director affirmed as modified November 30, 1989

# DOHERTY et al,
*Petitioners on Review,*

*v.*

# OREGON WATER RESOURCES DIRECTOR et al,
*Respondents on Review.*

## (CA A40087; SC S35460)

783 P2d 519

Larry A. Sullivan, Vale, argued the cause for petitioners on review. With him on the petition was W. F. Schroeder, Vale.

Philip Schradle, Assistant Attorney General, Salem, argued the cause for respondents on review. With him on the response to the petition were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

FADELEY, J.

**FADELEY, J.**

This is a judicial review of the state Water Resources Director's amended order, entered in 1986, declaring 274 square miles in Umatilla and Morrow counties a critical ground water area. Several agricultural irrigators challenge the order which can lead to controls on volume of water pumped from area wells. The Court of Appeals upheld the declaration of the Butter Creek Critical Ground Water Area with subareas, as well as the order that no new applications be accepted to appropriate ground water or to expand or change existing uses. *Doherty v. Oregon Water Resources Director,* 92 Or App 22, 758 P2d 865, *modified* 93 Or App 354, 762 P2d 330 (1988).

We allowed the petition for review to determine whether the director made insufficient findings and provided insufficient justification of his order.

Because we believe that certain statutory terms — relating to excessive decline of ground water levels and over-drawing of the available ground water in an area — are inexact terms, which the director correctly interpreted to advance the legislative policy by preventing rapid depletion of an underground water reservoir, and because the director properly applied statutory policy to the facts in the administrative record before him by sufficient findings and connective reasoning, we affirm the decision of the Court of Appeals.

Petitioners contend that one statutory policy standard, — providing that "depletion of ground water supplies below economic levels * * * be prevented or controlled within practicable limits" — should be interpreted to permit, not restrict, use of water whenever that use results in profitable agriculture. In short, they assert that holders of water right certificates or registrations have the right to pump a reservoir dry so long as the holders may profitably irrigate crops. Their contentions are presented, however, in terms of administrative law errors which, they allege, the director committed in the process of finding facts and stating conclusions as the foundations for his order establishing the critical ground water area.

The director's authority, and the policy standards involved in this case, flow from the Ground Water Act of 1955

codified in ORS 537.505 to 537.795. ORS 537.525 provided in part:

"The Legislative Assembly recognizes, declares and finds that the right to reasonable control of all water within this state from all sources of water supply belongs to the public, and that in order to insure the preservation of the public welfare, safety and health it is necessary that:

"(1) Provision be made for the final determination of relative rights to appropriate ground water everywhere with this state * * * through a system of registration, permits and adjudication.

"(2) Rights to appropriate ground water and priority thereof be acknowledged and protected, except when, under certain conditions, the public welfare, safety and health require otherwise.

"(3) Beneficial use without waste, within the capacity of available sources, be the basis, measure and extent of the right to appropriate ground water.

"* * * * *

"(5) Adequate * * * supplies * * * for human consumption be assured * * *.

"(6) * * * [C]apacity * * * of particular sources of ground water be determined.

"(7) Reasonably stable ground water levels be determined and maintained.

"(8) Depletion of ground water supplies below economic levels * * * and wasteful practices in connection with ground water be prevented or controlled within practicable limits.

"(9) Whenever * * * declining ground water levels, interference among wells, overdrawing of ground water supplies * * * exists or impends, controlled use * * * be authorized and imposed [under voluntary joint action with the users if possible, but if joint action is not taken or effective] * * * by the [director] under the police power of the state * * *.

"(10) * * * [Y]ield * * * of * * * wells be controlled in accordance with the purposes set forth in this section."

Elected representatives enacted statutory law stating what they wanted done and why. ORS 537.730 and ORS 537.735 authorized the director to establish a critical ground water area if the available supply is "being or about to be

overdrawn," water levels "are declining or have declined excessively," or if wells "interfere substantially with one another." The director entered an order establishing the Butter Creek critical area. On review the court considers the director's order pursuant to ORS 183.482(8) and determines whether the order is one which the ground water statutes authorize the director to make.

In *Diack v. City of Portland,* 306 Or 287, 301, 759 P2d 1070 (1988), this court stated that an agency order, to pass muster, must "adequately explain how the Commission applied the public interest criteria set out in [the statute involved] * * * pointing to the facts that * * * permit it to make the * * * findings and the conclusions it draws from them." Such findings must also be "sufficiently explicit * * * to allow meaningful judicial review." *Id.* In this case, the petitioners ask the court to overturn the order because, they assert, the director's findings are based on an inaccurate or insufficient understanding of the purposes of the statute and because the order fails to explain sufficiently how the director's findings and conclusions constitute an authorized application of the statutory words and purposes.

## FACTS

In ancient times many different lava flows occurred in the present area of the Columbia River, including Umatilla and Morrow counties. The lava flows generally tip downhill from the Blue Mountains on the south toward the Columbia River on the north. These flows, separated by varying centuries in time, contain irregular spaces between them in which water may collect and move.

The dense center of each flow restricts vertical movement of ground water as if the water were in pipes running laterally between the separate flows. However, some saturated zones are interconnected vertically by natural fractures or by wells.

The Umatilla Structural Basin consists of more than 2,200 square miles wherein these lava flows are present. In that basin, between 1965 and 1980, declines in underground water level of over 20 feet occurred in 862 square miles, declines of over 50 feet took place in over 600 square miles, and 13 cubic miles of the basalt aquifer were totally dewatered.

All municipalities in the Umatilla basin rely on underground water, and all have experienced declines in well water levels. The Butter Creek Critical Ground Water Area, consisting of 274 square miles, is geologically a part of the Umatilla Structural Basin. Some locations in the Butter Creek area show declines in water level of more than 150 feet during the director's 15-year study (1965-80). The director extended his study of declining water levels within the Butter Creek area from the beginning of well level records through 1983. Five wells declined more than 200 feet, three wells declined more than 300 feet and 19 wells have declined over 100 feet but less than 200 feet during the period of record for those wells.

The director also conducted experimental pumping of various adjacent wells within the Butter Creek area. The results show interference on occasion, consistent with a number of separate, interconnected sub-pools within the aquifer. This subterranean subdivision of the aquifer is also evidenced by a difference of more than 250 feet in the pre-pumping static water levels of certain neighboring wells, whereas no such difference exists between other neighboring wells. Carbon-14 dating of the underground water now being withdrawn indicates various well water sources were last exposed to the atmosphere over a range of time from the present day to the distant past, but predominantly from 2,570 to 27,290 years ago.

An underlying but unstated premise fact used in the director's reasoning is that water is part of a natural, physically interconnected system of our planet which migrates and changes in form, but which is not created or destroyed in nature, and that nature determines when, where, and in what amount rain and snow will fall. Annual water loss by surface evaporation, measured during recent times at Hermiston, is 31 inches. Annual precipitation, averaged over 75 years, is less than 10 inches.

The decline in well water level has occurred continuously over the years and is caused by pumping for irrigation, even when a current year's pumping is less than in previous years. The decline correlates roughly to the amount pumped.

## DIRECTOR'S ORDER

In October 1984, the Oregon Water Resources Director gave notice of a continued public hearing on December 5,

1984, for the determination of a critical ground water area in the Butter Creek area in Morrow and Umatilla counties.[1] The notice, which initiated a contested case proceeding under ORS 537.730, mentions the director's belief, based on data collected, that ground water levels in the area in question were declining or had declined excessively, thereby fulfilling the statutory predicate for the director's initiation of the proceeding. ORS 537.730(1). The statute provides that, after hearing, the director "shall" by order declare an area to be a critical ground water area if "any" of the statutory factors exist and he further finds that public welfare, health, and safety require that corrective controls be adopted. ORS 537.735(1).

## A. *Other Facts.*

The director entered other "findings of fact," not summarized above, which found, among other things, as follows:

> "The record indicates that approximately 500 wells serve as the source of water needed for domestic and stock water use by residents within the subject area. Although the volume of water withdrawn * * * for domestic and stock water needs is not large in comparison to the amount withdrawn for irrigation and other permitted uses, maintaining adequate and safe supplies of ground water in the subject reservoir for continuing these necessary uses is of considerable significance to the health, safety and welfare of the residents of the area.
>
> "* * * * *
>
> "Pumpage for irrigation is by far the largest water use affecting the ground water reservoir within the proposed critical ground water area.
>
> "* * * * *
>
> "Annual water level trends demonstrated by data collected

---

[1] The 1984 hearing was a continuation of hearings on the same subject held on February 18, 1976, and June 28, 1977, in that evidence presented at the earlier hearings was received as evidence in the 1984 hearing. The 1976 hearing resulted in a Water Resources Department order that the Court of Appeals reversed and remanded in *Campbell Ranch v. Water Resources Dept.,* 28 Or App 243, 558 P2d 1295 (1977), because the notice of the hearing was sent by regular rather than registered or certified mail. The 1977 hearing resulted in another order that the Court of Appeals in *Taylor Brothers Farms v. Water Resources Department,* 40 Or App 486, 595 P2d 849 (1979) (per curiam), reversed and remanded "for compliance with ORS 183.460." Neither of these procedural decisions dealt with the merits of the orders entered in both cases to establish a critical ground water area.

from within the proposed Butter Creek Critical Ground Water Area are mainly in response to pumpage for irrigation. When a pump is turned on, the ground water reservoir responds in the following manner: as water is removed from the well, the water level drops which causes a hydraulic gradient to develop toward the well within the reservoir. This causes a cone of depression to form within the ground water reservoir around the well.

"* * * * *

"The water level in the cone of depression begins to drop when a pump is turned on in the spring and, in the Butter Creek area, continues to decline until the pump is shut down. Then the water level begins to rise as the cone of depression fills and continues to rise until the pump is turned back on.

"* * * * *

"The sustained yield of a ground water basin is the amount of water that can be withdrawn from it annually without exceeding the long-term mean annual water supply to the reservoir. Withdrawals exceeding this supply must come from storage within the reservoir which results in long-term water level declines.

"Any draft in excess of the sustained yield of the basalt ground water reservoir in the proposed Butter Creek Critical Ground Water Area is overdraft."

The director found that testimony and evidence in the hearing record established both overdraft and excessive decline in water levels during the period for which records of well levels have been kept in the Butter Creek area. The director found that "existing developments have reached or exceeded the sustained yield capacity of the reservoir" in each subarea.

## B. *Opinion.*

The "opinion" portion of the director's order related the facts found to the statutory policy stated in the Ground Water Act of 1955 as follows:

"ORS 537.525(1)[,(3),] and (9) provide the declared policy of the Oregon Legislature to be that the beneficial use of the available ground water resource be limited to the 'capacity of the available sources' and that 'whenever . . . overdrawing of the ground water supplies . . . exists or impends, controlled use of the ground water concerned be authorized or imposed . . .' This declared policy requires that the ground water be managed to provide for development and use of the resource

within the sustained yield capacity of the ground water reservoir. The sustained yield concept of ground water management is further supported by ORS 537.525(7) which provides, 'Reasonably stable ground water levels be determined and maintained.' "

The director concluded that:

"In the absence of a voluntary joint agreement among the affected ground water users, additional controls on withdrawal to stabilize the water levels would be necessary to protect the welfare, health and safety of the ground water users and residents of the Butter Creek Critical Ground Water Area."

### C. Conclusion.

The director then entered conclusions of law that the available ground water supply "has been overdrawn," overdrafting has been cumulative, and continued withdrawal of water from storage, in excess of the natural re-supply, has resulted in a "cumulative, excessive decline of the water levels." The director's final conclusion of law is:

"In the interest of the public welfare, health and safety as set forth in ORS 537.525, it is necessary that adequate and safe supplies of ground water be maintained in the basalt ground water reservoir in the proposed Butter Creek Critical Ground Water Area for domestic and livestock and other beneficial uses of water, within the capacity of the resource. Therefore, it is necessary that the critical ground water area be closed to any further appropriation and that careful monitoring of water use occur."

### CLAIMED ERRORS

### A. Public Health and Welfare Not Defined by Director

Petitioners contend that the director erred in failing to state the standards applied to determine that public welfare, health, and safety require or permit both the designation of a Critical Ground Water Area and the application of corrective controls in the Butter Creek area. Without such standards, they urge, the director cannot justify his order.

The problem with the argument is that the Oregon Legislative Assembly in ORS 537.525 has already proclaimed such standards, to which the director referred explicitly in

justifying the order. The director's "opinion" quoted and referred to ORS 537.525(3), (7), and (9). In these provisions, the Oregon Legislative Assembly recognized, declared, and found, as a matter of policy, that it is necessary to maintain reasonably stable ground water levels, ORS 537.525(7), to base appropriation rights on beneficial use within the capacity of available sources, ORS 537.525(3), and to authorize and impose controls on uses if, among other things, a ground water reservoir is subject to existing or impending declining ground water levels or overdrawing of ground water supplies, ORS 537.525(9), all in order to preserve public welfare, safety, and health. ORS 537.525, 537.735(1).

It is true, as petitioners note, that ORS 537.735(1), requiring a finding that controls are required to protect public welfare, does not in express terms refer to ORS 537.525. But that does not make ORS 537.525 less relevant. ORS 537.525 sets forth the legislature's policy for the Ground Water Act of 1955, of which ORS 537.735 is a part. ORS 537.525 and 537.735 were enacted contemporaneously as sections 2 and 27 of the 1955 act. Or Laws 1955 ch 408 §§ 2 and 27. We conclude in this instance that similar statutory phrases found in ORS 537.525 and 573.735 are used in the same sense because they were enacted as part of the same statutory scheme. *See Pense v. McCall,* 243 Or 383, 389, 413 P2d 722 (1966). The director linked the objectives and interests to be protected, found in ORS 537.525, to the provisions which his regulatory order may include, found in ORS 537.735. The same linkage exists between ORS 537.525 policy and the similar provisions concerning proceedings to declare a critical ground water area in ORS 537.730(1). Moreover, in ORS 537.735, the legislature did refer to "public welfare, safety and health" under ORS 537.525. ORS 537.735(4) provided:

> "The order of the director [declaring a critical ground water area] may include any one or more of the following corrective control provisions:
>
> "* * * * *
>
> "(h)   Any one or more provisions making such additional requirements as are necessary to protect the public welfare,

health and safety in accordance with the intent, purposes and requirements of ORS 537.505 to 537.795."[2]

Overdrafting of available ground water supply is legislatively declared to affect public health, safety, and welfare. Excessive decline in ground water levels or interference between wells are also legislatively declared to affect public health, safety and welfare. The rational connection between the facts found, of excessive decline in water levels, and the choice made, of creating a critical ground water area so something may be done about it, is evident. Accordingly, we hold that the director's interpretation of the terms at issue was consistent with and a correct rendering of legislative policy. There is no merit to this claim of error.

**B.** *Overdrawn Supply and Excessive Decline in Water Levels Are Improperly Defined and Interpreted.*

### 1. *Insufficient Consideration of Economics.*

Petitioners argue that public welfare is best served if they are permitted to pump as much as they can use on crops which may be sold at a profit after pumping and other costs are paid. Petitioners also contend that, because the director did not consider whether the depletion of the resource made good economic sense under today's costs of production, the director erred in failing to establish a rational nexus between his Findings of Fact and his Conclusions of Law that the critical area must be established or that corrective controls are required.

Petitioners further argue that the statutes permit any amount of drawdown or any level of depletion of the underground water resource, if a current farmer can clear a profit on an irrigated crop. The statutory provisions which petitioners argue must be interpreted as limited by economic profitability of current-day irrigated agriculture are from three subsections of ORS 537.525, which provide that it is necessary that:

"(3) Beneficial use without waste, within the capacity of

---

[2] Provisions of the Ground Water Act of 1955 are presented as they existed when the order was signed, prior to amendments made by Oregon Laws 1985, chapter 673, and Oregon Laws 1989, chapters 99, 129, 201, 758, 833, and 939.

available sources, be the basis, measure and extent of the right to appropriate ground water.

"* * * * *

"(5) Adequate and safe supplies of ground water for human consumption be assured, while conserving maximum supplies * * * for agricultural, commercial, industrial, [and] recreational * * * uses;

"* * * * *

"(7) Reasonably stable ground water levels be determined and maintained."

Petitioners contend that the portion of ORS 537.525(8) which states "Depletion of ground water supplies below economic levels * * * be prevented or controlled within practicable limits" supports their claim that economic feasibility must be read into all other policy subsections of the ground water act as a limiting factor. The water should be looked at as a resource similar to gold in a mine and withdrawn totally so long as it is economically feasible to do so, they urge. Writers, whom they cite in support of this concept, advocate that the government establish a time period, such as 25 years, for using up all of the water.

This argument would say that the statutory words of "overdraft" and "excessive decline" in water levels cannot be interpreted to apply to the practice of progressively lowering water levels or permanent depletion of the resource in annual steps if the practice nonetheless provides profitable agriculture today. That is, if the farmer can afford the electricity to pump the water from greater depth and still raise a profitable crop, it cannot be overdraft or excessive decline. In that circumstance, they contend, there is no interference with public health, safety, and welfare, even though no irrigating agriculturalist has suggested that a profit can *only* be made by pumping the reservoir dry within the next 25 years or any other short-term period. A logical corollary of this mining-analogy argument is that the public health, welfare, and safety are simply not involved where the current generation profitably extracts all of the resource and leaves agricultural ghost towns.

The statutory scheme in the Ground Water Act of 1955 does not support this argument. Instead, the act is

designed to prevent that result. The act established the critical area mechanism to assure a reasonably stable, adequate water supply which may be beneficially used only within the capacity of the available resource and is protected against overdrawing, declining water levels, and interference among wells. ORS 537.525.

Prior legislative developments concerning water use in Oregon buttress the director's reading of the 1955 act to foster long-term conservation of the resource rather than unimpeded consumption of it. *See* Or Laws 1891, § 1, p 52, (declaring use of surface water a public use); Or Laws 1909, ch 221, § 1 (declaring all water from all sources belong to public; limiting water use certificate to 40 years' duration); Or Laws 1909, ch 216, § 4 (requiring state-appointed water superintendents to secure equal and fair distribution of water), and § 71 (granting City of Portland exclusive right to waters of Bull Run and Little Sandy rivers); Or Laws 1927, ch 410 (requiring application to and approval by the state engineer for appropriation of underground water east of the Cascades; exempting uses for domestic, culinary, stock and one-half acre lawns or gardens; granting state engineer power to conserve underground waters by limiting irrigation use); Or Laws 1933, ch 263, § 1 (reasserting that underground waters east of the Cascades "belong to the public"), ch 263, § 3 (requiring artesian wells to be fitted with means to conserve flow when not put to beneficial use).[3]

We agree with the director and the Court of Appeals that ORS 537.525(8) does not mandate depletion to the lowest water level from which irrigation water may be profitably pumped today. A fair reading of subsection (8) casts it as a restriction on, rather than a justification for, depletion of ground water. The water-mining theory fails because it is inconsistent with the legislative act.

---

[3] *See also* Bonney, *Oregon's Coordinated-Integrated Water Resources Policy,* 3 Will L J 295 (1965). Prompted by a letter in 1907 from Governor Chamberlain, the State Engineer published "The Need of Water Legislation," which states: "Why is it necessary at this late date . . . to burden ourselves in extending the police power * * *? Water is one of the necessities of life and one of the most important of our great natural resources. It is not inexhaustible like the air we breath, but . . . it can be monopolized by the few to the detriment of the many, unless guarded by proper legislation." *See also In re Hood River,* 114 Or 112, 171, 227 P 1065, 1084 (1924) (espousing the principle of making the water do the greatest good for the greatest number).

## 2. *Inadequate Analysis and Application of the Facts to the Statute.*

Petitioners also contend that the order is but a "regurgitation" of the statutory language because the director did not elucidate how much drawdown of wells in an area is needed to satisfy the statutory criteria mandating a critical water area where available ground water supply is being or is about to be overdrawn. Petitioners iterate this claim of error because of the director's silence about how much decline in levels is excessive decline, but do not contest his order for failure to describe how much interference between wells is required to sustain that third, independent, statutory basis mandating that a critical ground water area be established. Petitioners rely on *Diack v. City of Portland,* 306 Or 287, 300-01, 759 P2d 1070, but that reliance is misplaced.

In *Diack* this court stated, in interpreting a different act of the legislature:

"Petitioners also object that the Commission failed to explain how it applied the standards set out in ORS 537.170(5)(b) and (e). ORS 537.170(5) provides, in part:

" 'In determining whether the proposed use would impair or be detrimental to the public interest, the Water Resources Commission shall consider:

" '* * * * * *

" '(b) The maximum economic development of the waters involved.

" '* * * * * *

" '(e) The prevention of wasteful, uneconomic, impracticable or unreasonable use of the waters involved.'

"This provision represents a complete expression of legislative policy. The terms, 'maximum economic development' and 'wasteful, uneconomic, impracticable or unreasonable use,' are examples of what this court has called 'inexact terms.' *Springfield Education Assn., supra,* 290 Or at 224. In such a case, it is the agency's task to interpret ambiguous statutory terms in a way that effectuates the underlying statutory policy. The agency may do so either by rule or by order in a contested case." 306 Or at 300-01.

This court held in *Diack* that repetition of the statutory words, in the form of a conclusion "without analysis," was legally

inadequate and that on remand the agency making the order in that case should "explain more fully its application of the public interest criteria" by pointing to facts that permit it to make the findings and conclusions which that agency drew from those facts. 306 Or at 301.

The defects in the order reversed in *Diack* are not present in the director's detailed, logically connected order in this case. The inexact terms here are less ambiguous than those in *Diack* and the director has pointed out the facts of significant, cumulative decline of water levels upon which he relies to conclude that the statutory criteria are established. His order is not only justified by facts found which he rationally connected to statutory criteria but also is statutorily mandated. Accordingly, the "regurgitation" argument fails.

### 3. *"Overdrawn" Finding Improperly Based on Annual Recharge Standard.*

■ Petitioners assert that the director used an annual reservoir recharge rate as the guideline by which he interpreted the statutory term "overdrawn." They invite our inquiry on review to whether an annual overdraft standard is too stringent. The petitioners are equally dissatisfied with the 15-year study and, were the director to select a 50-year period, apparently would still assert error. They contend that the proper period for determining whether an overdraft in excess of reservoir recharge is occurring would be in the thousands of years. They assert that present day recharge comes from the Blue Mountains only intermittently, sometimes arriving at the reservoir thousands of years after the precipitation supplying the recharge fell there.

The argument is not supported by the record. Absent evidence needed to support the assertion that a cycle of millennial recharge exists, neither we nor the director should speculate upon that theory. In any event, the director determined overdraft by relying on cumulative overdraft over a 15-year period, not by an annual recharge standard. Moreover, the legislative direction under which he acted gives no hint that it is designed to accommodate pumping the reservoir dry on an expectation of refilling sometime within the next few thousand years. We need not reach any issue about whether "overdrawn" may be interpreted to mean overdraft for only

one year. The opinion portion of the director's order does define overdrawing in terms of annual recharge to the reservoir. However, the director did not rely upon annual overdraft but rather the "sustained yield capacity" or "concept" as in interpreting and applying ORS 537.525(7), which provides that "reasonably stable ground water levels be determined and maintained."

The director found that precipitation in the area in recent years was higher than long-term averages, but that cumulative decline in water levels continued. He also found that the sustained yield of the ground water basin should be defined in terms of "the long-term mean annual water supply to the reservoir." We agree with the director that a sustained yield concept is consistent with the words of ORS 537.525(7) and the policy of ORS 537.525. The claim of error fails because the director's approach is consistent with the statute.

### 4.  *Selective Enforcement is Impermissible.*

■  Petitioners point out that the Butter Creek area is only a part of the Umatilla structural basin and that others, outside the Butter Creek area, are using up the same general underground reservoir but are not being subjected to the usage controls which the critical area designation threatens to visit upon them.[4] They contend that no critical area may be formed unless all irrigators using the interconnected underground water source are similarly regulated. They argue that partial regulation would be ineffective and ineffective regulation does not promote public welfare. The Ground Water Act of 1955 appears to contemplate an area-by-area enforcement, especially because interference among wells is one ground for creating a critical area. Simultaneous enforcement throughout a basin is not required by statute. The record does not show that partial regulation would be ineffective and thereby does not show that partial regulation fails to promote public welfare, health, or safety.

### CONCLUSION

The critical area designation order, as modified, does not detract from petitioners' priority in relation to other

---

[4] The director has declared the Boardman critical ground water area, located west of the Butter Creek area, but has not declared any in the large expanse of the Umatilla structural basin to the east and northeast of Butter Creek.

pre-existing uses or users or in relation to any new users of the resource other than, perhaps, for residential or livestock watering given statutory preference. Or Laws 1955, ch 708, § 27(c); ORS 537.735(4); *see also* ORS 537.525(5). Because the director's line of reasoning tends to advance relevant legislative policy, we conclude that the director's interpretation and application of the statutory terms involved are not erroneous, and we uphold them. *See Springfield Education Assn. v. School District,* 290 Or 217, 224-226, 621 P2d 547 (1980). Because he has entered findings of fact sufficient to satisfy the statutory conditions for designating a critical ground water area and has rationally related factual findings to the statutory conditions, his order is justified under the terms of the legislative enactment.

The Order of the Oregon Water Resources Director, as modified by the Court of Appeals, is affirmed. The decision of the Court of Appeals is affirmed.